ABRAHAM KOSHLAND & others *vs.* COLUMBIA INSURANCE COMPANY.

Suffolk.   November 12, 1920. — March 1, 1921.

Present: RUGG, C. J., BRALEY, DE COURCY, CROSBY, & PIERCE, JJ.

*Insurance,* Flood, Of goods "in transit."  *Words,* "Actually in transit," "Risks of transportation."

A policy of insurance issued to a Boston wool merchant, who purchased wool "in the grease" in California and sent it for grading, blending, scouring and baling to a certain mill in that State situated about half a mile from a railroad, whence it was to be shipped to destinations as ordered by the merchant, insured the merchant against loss as to the wool "at and in transit between ports, and places in the United States and Canada covering same by railroads, ferries, Sound and / or other Inland Steamers and / or other conveyances, and by [certain] Coastwise Lines of Steamers . . . " and covered "all risks of fire and navigation and transportation, including floods, including risk in and / or on docks, wharves, piers, and / or bulkheads, landing sheds, depots, stations and / or platforms awaiting shipment and / or after arrival, from the time of leaving the warehouse, store or factory of shipper until safely delivered to warehouse, store or factory of consignee, or until the assured's risk ceases, whichever may first occur, but this policy to cover only while goods are actually in transit, and not including risk of craft to or from ocean-going vessel, on export or import shipments . . . also . . . against loss by theft of entire shipping packages while in transit in the custody of any common carrier or other bailee. . . ." Owing to crowded conditions at the mill, the grading, blending, scouring and baling of the wool there were much delayed and some of it had remained there for eight months in storage in a warehouse. The mill made no separate charge for storage of the wool. While it was in storage, owing to an unprecedented flood, the wool was damaged. *Held,* that
(1) As a matter of law upon a construction of the policy in the circumstances the wool, when damaged, was not "actually in transit" or in the course of "transportation;"
(2) In the circumstances and as a matter of law the wool when damaged was not at a place or under conditions which brought it within the scope of the insurance contract.

CONTRACT upon a policy of insurance for loss suffered by the plaintiffs by reason of damage by a flood to wool alleged to have been covered by the policy. Writ dated March 3, 1908.

In the Superior Court the action was heard by *Hitchcock,* J., without a jury, upon an agreed statement of facts and the testimony of one witness. Material facts are described in the opinion. At the close of the evidence, the defendant moved for a finding in its favor. The judge found for the plaintiffs in the sum of $10,512.86; and the defendant alleged exceptions, which, after the death of *Hitchcock,* J., were allowed by *Wait,* J.

*P. B. Buzzell,* (*A. Hemenway* with him,) for the defendant.

*D. A. Ellis,* (*S. M. Whalen* with him,) for the plaintiffs.

RUGG, C. J. This is an action of contract on a policy of insurance issued to wool merchants on or about April 2, 1906, for the term of one year. The policy consists of a printed form with general provisions and a typewritten rider called "Transportation Floater" annexed to and made a part of the policy. The contract so far as material to this action is mainly set forth in the rider. The subject matter of insurance was "goods and merchandise, including packages, consisting principally of Wool and Bags and Bagging." The places, where the wool was to be covered by insurance, were "at and in transit between ports, and places in the United States and Canada covering same by railroads, ferries, Sound and / or other Inland Steamers and / or other conveyances, and by Coastwise Lines of Steamers navigating Long Island Sound (not east of New Bedford) and / or Hudson River and / or New York Harbor and / or Boston Harbor." There was provision that the policy should not cover shipments over certain waterways not now material, but was to cover "risk by ferry or other transfer boats running in connection with all Railroutes." The risk insured against was described in these words: "To cover all risks of fire and navigation and transportation, including floods, including risks in and / or on docks, wharves, piers, and / or bulkheads, landing sheds, depots, stations and / or platforms awaiting shipment and / or after arrival, from the time of leaving the warehouse, store or factory of shipper until safely delivered to warehouse, store or factory of consignee, or until the assured's risk ceases, whichever may first occur, but this policy to cover only while goods are actually in transit, and not including risk of craft to or from ocean-going vessel, on export or import shipments. It is understood that this policy also covers against loss by theft of entire shipping packages while in transit in the

custody of any common carrier or other bailee, but this clause shall under no circumstances be construed to include pilferage. . . . In the event of loss, for which claim may be made under this policy, the valuation of the merchandise insured hereunder shall be the actual invoice cost, together with such costs and charges since shipment as may have accrued and become legally due thereon . . . but in the absence of an invoice, the market value of the article insured, at point of destination on the day of the disaster shall be considered the valuation of the merchandise insured hereunder."

The only controversy between the parties is whether the loss of the plaintiffs or any part thereof took place under such circumstances as to be covered by the policy. The pertinent facts in that connection, stated summarily, are that the plaintiffs, being wool merchants, with a place of business at Boston, in their course of business buy wool either on the sheep or "in the grease" (that is, in the uncleaned condition in which it is when taken from the sheep), from growers in certain States of this country which lie west of the Mississippi River; such wool is usually transported to Boston, whence it is sold and delivered to the customers of the plaintiffs, but wool bought in California was at the time of these events customarily, and for greater economy, gathered from the various places of purchase and assembled at Stockton, California, where were the only available public scouring mill and other facilities for grading or sorting, blending and baling wool in that State, those previously existing at San Francisco having been destroyed in April, 1906. This scouring mill was situated about one half mile from the railroad. Close by were two warehouses for the storage of wool awaiting treatment in the mill, wool in process of grading or sorting and blending, and wool awaiting transportation to its destination. Representatives of the plaintiffs from August, 1906, to March, 1907, bought wool in varying quantities at divers places in California, with the understanding and intention of sending it to Stockton for scouring and the other treatment, then forwarding it to Boston, save in the rare instances of sales in the West. The processes of grading, blending and scouring of the wool which were essential in order to make it salable to the plaintiffs' customers required the assembling of quantities of wool in one place, and it was necessary to

mix the wool in large lines so as to secure proper mixes to be scoured advantageously. About twenty per cent of the wool was purchased in Stockton or its immediate neighborhood, and delivered at the scouring mill or one of the warehouses by team, being the vendees' property and at their risk from the time it started to be conveyed, they also paying the expense of conveyance. The remaining eighty per cent of the wool was purchased at places so far from Stockton that transportation by rail was required, each lot being deliverable by the seller to the railroad at the nearest railroad station consigned usually to purchasers, at Stockton, title passing and the wool being at their risk after delivery to the railroad, and on arrival at Stockton being carried by team to the mill or warehouse, expense of rail transportation and teaming being borne by the buyers. The plaintiffs' representatives in Stockton attended to the transportation, grading, blending, scouring, baling and forwarding of this wool and in ordinary course all wool after treatment would have been teamed back to the railroad station in Stockton and shipped in carload lots to the plaintiffs at Boston, except in the extraordinary event of a sale of small lots in the West. Because of the destruction of the scouring mills at San Francisco, the mill at Stockton was much congested. Under ordinary conditions wool for such treatment would have been in Stockton from three to six months between receipt and reshipment, but at the time in question, by reason of these unusual conditions, some of the plaintiffs' wool had been in the Stockton warehouse more than eight months and the rest for varying lesser periods down to a few days. On March 18, 1907, an unprecedented flood overflowing the banks of the river at Stockton damaged a large quantity of the plaintiffs' wool. In the usual course of business, when wool was sent to the warehouses at Stockton with instructions to be scoured, as in the present case, only one charge was made for the entire treatment and this was nominally for scouring. There was no separate charge made for storage; and the charge was the same regardless of the time the wool was in the warehouses. If, however, wool was sent to the warehouses in the first instance without instructions for scouring, a separate charge for storage was made whether or not it was afterwards decided to have the wool scoured. All the wool in the present case was sent to the warehouses with instructions to be scoured and received there for that purpose and

for the usual and necessary incidental purposes of grading, blending and baling. It was not sent or received for purposes of storage, although the parties concerned knew that in the ordinary course of business the wool would be in storage for some time awaiting access to the scouring mill. The history of the wool in the present case was in accordance with the usual practice both of the plaintiffs and of the wool trade in general except for the unusual conditions as to scouring and storage facilities heretofore recited and except for the flood. By this practice wool was purchased by eastern firms in various places in the West at various times and in various sized lots, the conditions as to purchase being similar to those in the present case, was assembled at available mills to be scoured, was there sorted, graded and blended so as to secure proper mixes and was then scoured, baled and forwarded to its destination in carload lots.

The case was tried before a judge without a jury, chiefly upon a written agreement as to the facts. An expert in marine insurance called by the defendant testified orally, but that is immaterial in the view which we take of the controlling principles of law.

Compliance with all conditions precedent to recovery under the policy to be performed by the insured in case of loss is admitted.

Confessedly the cause of loss was the flood, which was one of the risks included within the express terms of the insurance.

The finding was for the plaintiffs and the defendant's exceptions bring the case here. The question presented is whether on all the evidence the finding was warranted as matter of law. *Frati* v. *Jannini*, 226 Mass. 430.

A policy of insurance is a contract in writing. It is to be construed and interpreted according to the fair and reasonable meaning of the words in which the agreement of the parties is expressed. When for any reason there is ambiguity in the terms employed in the policy, every doubt is to be resolved against the insurer and in favor of the insured. There are two reasons for this rule: (1) the purpose of such a contract is indemnity against the losses to which the insurance relates and every rational intendment is made by the law to effectuate the main design of the parties, *Hatch* v. *United States Casualty Co.* 197 Mass. 101, *Cutting* v. *Atlas Mutual Ins. Co.* 199 Mass. 380, 382, *Rosenfeld* v. *Boston*

*Mutual Life Ins. Co.* 222 Mass. 284, 287; and (2) as matter of common knowledge the contract is drawn by the insurer in the light of wide experience and with the aid of highly skilled advisers and hence is to be construed most strongly against the person using the equivocal language. *Rocci* v. *Massachusetts Accident Co.* 222 Mass. 336, 344. *New York Central Railroad* v. *Stoneman,* 233 Mass. 258, 262. *Aldrich* v. *Bay State Construction Co.* 186 Mass. 489, 491. An insurance policy also is to be construed with reference to the customs of the trade or course of business respecting which it is issued. The insurer is charged with notice of such practices and his liability is to be determined in that light. *A. J. Tower Co.* v. *Southern Pacific Co.* 184 Mass. 472. *Mooney* v. *Howard Ins. Co.* 138 Mass. 375. *Daniels* v. *Hudson River Fire Ins. Co.* 12 Cush. 416, 430. When a contract has been made, plain in its words and free from doubt as to its meaning, the parties must be held to be bound even though the result may seem to be hard upon one or both of them. The contract must be enforced according to its terms. *Stone* v. *Howard Ins. Co.* 153 Mass. 475, 479.

The crucial point in the case at bar is whether the wool was covered by the contract of insurance while in the mill and warehouses at Stockton for the purpose of scouring, grading, blending and baling. The decision of that point depends upon the meaning of the words "at and in transit," "risks of . . . transportation," "to cover only while goods are actually in transit" and "while in transit" in their context in the contract for insurance. The natural meaning of the words "transit" and "transportation" as applied to wool is that it shall be in the course of movement by some kind of carriage from one place to another. They are words which according to their etymology signify in relation to merchandise a carrying across or progress over a portion of the earth. Their history and derivation denote the course of change of position from one locality or place to another. It was said in *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 196, at page 203, "Transportation implies the taking up of persons or property at some point and putting them down at another." *United States* v. *Sheldon,* 2 Wheat. 119. *People* v. *Suydam,* 204 N. Y. 419, 422.

The delays commonly incident to a movement of merchandise across the continent would not ordinarily be thought to suspend

transportation or transit. See *Tompkins* v. *Boston Elevated Railway,* 201 Mass. 114; *Powers* v. *Old Colony Street Railway,* 201 Mass. 66; *Gurley* v. *Springfield Street Railway,* 206 Mass. 534. A stoppage of the nature and for the purposes disclosed by the facts here agreed, to the ordinary mind, is different in kind. It is long in point of time, many times longer than the period of actual carriage by trains in motion. The main purpose of that stoppage is to prepare the wool for market rather than as a simple incident of movement across the country.

There has grown up in connection with the carriage of animals and merchandise of sundry kinds for long distances over railroads a secondary meaning of the word "transit." For the benefit of owners of goods in the course of movement between widely separated localities the railroads have established what are termed transit privileges, that is, the privilege of unloading goods and applying to them some process for their preparation for ultimate market and reloading and carriage on to their destination as a single shipment at a through rate, and with or without a comparatively small additional charge. In the abbreviation which language sometimes undergoes in use, the word "transit" has acquired the meaning of this privilege of stopping over goods in course of carriage, being almost the reverse of its primary significance. See, for example, *In re Transportation of Wool, Hides, & Pelts,* 23 I. C. C. Rep. 151, 169–177, where the word "transit" alone is used to describe this stop-over privilege for the purpose of assorting and grading wool. See, also, *Board of Trade of Chicago* v. *Ann Arbor Railroad,* 39 I. C. C. Rep. 643, 651. See *Interstate Commerce Commission* v. *Diffenbaugh,* 222 U. S. 42. In other connections the word sometimes has been given a large meaning. For example, it has been given a wide definition in prize cases arising during war in the development of the doctrine of continuous voyage as ground for preventing contraband of war from reaching the enemy. In *The Bermuda,* 3 Wall. 514, it was said at page 553: "A transportation from one point to another remains continuous, so long as intent remains unchanged, no matter what stoppages or transshipments intervene;" and at page 554: "If there be an intention, either formed at the time of original shipment, or afterwards, to send the goods forward to an unlawful destination, the continuity of the voyage will not be

broken, as to the cargo, by any transactions at the intermediate port." See, also, for other cases of this sort, *The Consul Corfitzon*, [1917] A. C. 550; *The Balto*, [1917] P. 79. When questions concerning federal control of interstate commerce and facilities connected therewith have arisen, broad conceptions have sometimes been enforced. At the time of its damage by flood the wool had not begun a transit in interstate commerce. That is defined in *Coe* v. *Errol*, 116 U. S. 517, 525, to be when goods are "committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State." In this respect the case resembles *Arkadelphia Milling Co.* v. *St. Louis Southwestern Railway*, 249 U. S. 134, 151, *McCluskey* v. *Marysville & Northern Railway*, 243 U. S. 36, and cases of like character, rather than *Philadelphia & Reading Railway* v. *Hancock*, 253 U. S. 284, *Louisiana Railroad Commission* v. *Texas & Pacific Railway*, 229 U. S. 336. *Texas & New Orleans Railroad* v. *Sabine Tram Co.* 227 U. S. 111, and *Southern Pacific Terminal Co.* v. *Interstate Commerce Commission*, 219 U. S. 498, 525–527, and similar cases.

There is, therefore, at first sight plausibility in the contention that the word "transit" in the contract here in suit was used in a sense broad enough to include the process of grading, scouring, blending and baling wool at Stockton. But a closer analysis seems to us to show clearly that it cannot be that the word was used with that meaning in this insurance policy. The wool of the plaintiffs had not been shipped on its transcontinental journey at the time it was damaged by flood.

Doubtless it came under the insurance of the policy when loaded on teams in the immediate neighborhood of Stockton or when delivered to the railroad for carriage to Stockton. From the railroad standpoint the shipment to Boston had not begun. These shipments had Stockton for their destination. No through bills of lading were issued. A part of the purpose of the treatment of the wool at Stockton was to diminish its bulk and thus render less the freight rates to Boston. The time had not arrived when the peculiar meaning which might attach to "transit" as a part of a through railroad shipment came into existence. That the word was not used to include such a prolonged stoppage as that at Stockton and for the treatment there undertaken respect-

ing the wool seems to us apparent from the express words of the "Transportation Floater," "but this policy to cover only while goods are actually in transit." The significant word in this phrase is "actually" in connection with the words "in transit." It is a well settled canon in the interpretation of contracts, especially those which give internal proof of having been drawn with care, that every word used shall be given force so far as reasonably possible. The word "actually" in this connection hardly can be treated as a mere expletive adding by its presence nothing to the meaning of the contract. Its normal function is to give genuine emphasis and direct point to the dominant thought, expressed by the word or phrase which it modifies. Actual cost commonly means the bare disbursement stripped of any element of profit. *Mayor & Aldermen of Newton, petitioners,* 172 Mass. 5, 10. *Mayor & Aldermen of Worcester* v. *Boston & Albany Railroad,* 213 Mass. 567, 571. *Fillmore* v. *Johnson,* 221 Mass. 406, 412. Actual notice means something more than knowledge of facts which ought to put one on inquiry. It is different from implied or constructive notice. It signifies definite and intelligent consciousness of the fact involved. *Parker* v. *Osgood,* 3 Allen, 487. *McNeil* v. *O'Brien,* 204 Mass. 594, 596. Actual purchase or sale rises above a colorable transaction and reaches to a veritable transfer of complete title to existing real or personal property. *Fiske* v. *Doucette,* 206 Mass. 275, 283. Actual residence means personal presence. *Sears* v. *Boston,* 1 Met. 250. Actually occupied means individual physical possession. *Commonwealth* v. *Dean,* 1 Pick. 387. Insurance on railroad cars in "actual use" was held to mean "cars in actual service, fit for use, and in daily use" in the business of the owner as distinguished from those "in machine or repair shops" excluded in the policy. *Fitchburg Railroad* v. *Charlestown Mutual Fire Ins. Co.* 7 Gray, 64. This review of decisions demonstrates that this court consistently has given weight to the use of the words "actual" and "actually" as adding something to what the meaning would have been without them. See, also, in this connection *Wood* v. *General Accident Ins. Co. of Philadelphia,* 88 C. C. A. 108, 160 Fed. Rep. 926; *Penix* v. *American Central Ins. Co.* 106 Miss. 145, 165; *Ex parte Moses,* L. R. 9 Q. B. 1; *In re Calf & Sun Ins. Office,* [1920] 2 K. B. 366; *In Matter of Battle of Falkland Islands,* [1917] P. 47.

In its context in this contract the word "actually" accentuates and conveys added force to the natural signification of "transit." It directs thought to the very essence of the word. Its effect is to exclude that which constructively might come within an elastic conception of "transit" and to confine its purport to that which in truth is a real movement of the property insured in physical portage from point to point. The property would of course be protected under the policy during the ordinary delays and transhipments incident to such movement. But the policy cannot, with due regard to the significance of the words in which the agreement of the parties is set forth, be stretched to cover the property under the circumstances here shown.

This construction receives some confirmation from other parts of the policy, which have a tendency toward limitation. There is specification in considerable detail that the policy is "to cover risk by ferry or other transfer boats running in connection with all Rail routes," and includes risks on docks, piers and other places awaiting shipment or after arrival. These would be superfluous provisions if the words "transit" and "transportation" are to be given the comprehensive meaning and large import urged by the plaintiffs. This careful particularization also renders significant the omission of words definitely including the wool while in mill or warehouse for scouring, grading, blending and baling. In view of the other provisions of the policy, it seems inconceivable that some appropriate words would not have been inserted plainly to cover the wool while undergoing that treatment, if such had been the intention of parties. The words "while in transit in the custody of any common carrier or other bailee" and the use of "bailee" in the policy do not in connection with the other parts of the policy express the thought that the wool may be taken out of the course of transportation by the owners and stored on their own account under the conditions here disclosed. Circumstances might arise in ordinary carriage where temporarily the wool might be in such bailment. The wool at the time of injury was half a mile away from the line of any railroad in a warehouse or mill selected by the insured. The definition of "transportation" contained in the Hepburn Act, act of Congress of June 29, 1906, c. 3591, § 1, 34 U. S. Sts. at Large, 584, cannot aid the plaintiffs because (1) it was enacted after the

issuance of the policy here in suit and (2) it expressed an enlarged definition especially applicable to common carriers. *Ellis* v. *Interstate Commerce Commission,* 237 U. S. 434. *Cleveland, Cincinnati, Chicago & St. Louis Railway* v. *Dettlebach,* 239 U. S. 588.

In the light of all these circumstances as matter of law it cannot rightly be said that the wool of the plaintiffs was at a place and under conditions to be within the scope of the insurance contract against the loss here sustained. While no case is very near to this in its facts, the following are interesting in this connection: *Graham* v. *Ins. Co. of North America,* 220 Mass. 230. *Graustein* v. *Employers' Liability Assurance Corp. Ltd. of London,* 214 Mass. 421. *Palatine Ins. Co. of London* v. *Kehoe,* 197 Mass. 354. *Goodhue* v. *Hartford Fire Ins. Co.* 184 Mass. 41. *H. P. Hood & Sons* v. *Commonwealth,* 235 Mass. 572, 576. *Slinkard* v. *Manchester Fire Assurance Co.* 122 Cal. 595. *Langworthy* v. *Oswego & Onandaga Ins. Co.* 85 N. Y. 632. *Minneapolis Threshing Machine Co.* v. *Fireman's Ins. Co.* 57 Minn. 35. *Ripley* v. *Insurance Co.* 16 Wall. 336. *Mawhinney* v. *Southern Ins. Co.* 98 Cal. 184.

It follows that the request of the defendant that the plaintiffs were not entitled to recover and that a finding be made in its favor ought to have been granted. This is a case where upon the agreed facts no other result can be reached. Hence the defendant's exceptions must be sustained and in accordance with G. L. c. 231, § 122, rescript shall direct entry of judgment for the defendant.

*So ordered.*