Charles H. Cohen, J.
This is an action brought by plaintiff against defendant to recover on an insurance policy in force between December 30, 1972, and December 30, 1973, insuring goods and merchandise of plaintiff consisting of formal wear, *423 for loss "in transit while loaded for shipment in or on vehicles described herein”. Plaintiffs claim is based upon a theft endorsement to the policy. Defendant does not dispute the coverage under the theft endorsement, but disputes liability upon the grounds that: (1) at the time of the alleged loss, the goods were not "in transit;” (2) plaintiff did not give timely notice of loss; (3) plaintiff did not fulfill the conditions of the "Theft Endorsement-With Alarm Protection Warranty;” and (4) plaintiff did not prove damages.
1. In transit. Plaintiff was in the business of selling and renting tuxedos. On October 12, 1973, a driver of one of its vehicles covered by the policy, in the course of his duties, which generally involved the pick up and delivery of tuxedos at plaintiffs various stores, picked up 106 black tuxedos from a company called Haricon. He proceeded with these tuxedos, together with others he had picked up, to plaintiffs Far Rockaway store. Upon arrival there, he rolled up the windows of the vehicle, locked it, turned on the alarm and entered the store. After checking into the store, he came out to the vehicle where certain tuxedos were unloaded from the vehicle and others, including 10 gray tuxedos, were placed into the vehicle before he continued on to his next destination, plaintiffs Lynbrook store. He went back into the Far Rockaway store after locking the vehicle and turning on the alarm. When he returned to the vehicle about 10 minutes later, intending to continue on to Lynbrook, he found that a window had been broken and that 78 of the black tuxedos, which had been picked up at Haricon, plus the 10 gray tuxedos, which had been loaded at the Far Rockaway stop, were stolen. The alarm had not gone off and the driver later found, when he tried to start the vehicle, that the battery cables had been disconnected.
In support of its claim that the tuxedos were not "in transit” at the time of the loss, defendant relies on Starlight Fabrics v Glens Falls Ins. Co. (297 NY 426), Mayflower Dairy Prods. v Fidelity-Phenix Fire Ins. Co. (170 Misc 2) and Brammer Corp. v Holland-America Ins. Co. (34 Misc 2d 337, affd 19 AD2d 697). Starlight is completely distinguishable from the instant case since it involved goods which were stolen at the insured’s premises by an imposter who said he was the truck-man sent to pick up the goods. Mayñower and Brammer stand for the proposition that goods which were merely loaded into a truck where transportation was not about to begin, are not *424 "in transit.” In Mayflower the court found that there was no coverage when goods were stolen from a truck which was loaded one day, with transit to begin on the following day. In Brammer the goods were loaded on a truck and kept in a building where they were stolen. Moreover, in Brammer (supra, p 338), the policy specifically stated that "insurance attaches from the time the goods leave the Warehouse and/or Store at the place named in the policy for the commencement of transit”.
In this case there was more than the mere loading of the vehicle. The black tuxedos were loaded at Haricon and transported in plaintiff’s vehicle which made a stop at the Far Rockaway store for loading and unloading before the vehicle was to proceed to Lynbrook. By any meaningful definition of "in transit,” the black tuxedos were in transit when they were stolen. As stated in Underwood v Globe Ind. Co. (245 NY 111, 115): "To hold that transit means actual movement, and not a period of rest, is too narrow a construction to give this undertaking, and is contrary to its full meaning and scope.” The movement of these tuxedos was merely temporarily interrupted when the vehicle stopped at the Far Rockaway store. The test "is whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of delivery.” (Franklin v Washington Gen. Ins. Corp., 62 Misc 2d 965, 966-967, affd 36 AD2d 688; to the same effect, see Pulitzer Creations v Phoenix Ins. Co., 47 Misc 2d 801. See, also, Mayflower Dairy Prods. v Fidelity-Phenix Fire Ins. Co., 170 Misc 2, 3, supra, which, while stating that "in transit implies the continuous action of moving the goods from the one point and putting them down in another,” recognized that it includes the period during "temporary stops, incidental to the process of delivery”.)
A closer question is presented concerning the gray tuxedos. Since these tuxedos were not placed in the vehicle until after it arrived at the Far Rockaway store, defendant contends, based upon language found in Mayflower and Brammer, that these tuxedos could not possibly be within the coverage of the policy. Yet, a reasonable interpretation of "in transit loaded for shipment” would extend coverage to the gray tuxedos as well. Unlike Mayflower and Brammer, the tuxedos were not merely being stored in the vehicle when they were stolen. Transportation of the tuxedos to Lynbrook was about to begin *425 in a vehicle which had arrived shortly before and which was about to continue on to the next point.
Since this phrase is not defined in the policy, it should be given a meaning consistent with the "reasonable expectation and purpose of the ordinary businessman when making an ordinary business contract.” (Bird v St. Paul Fire & Mar. Ins. Co., 224 NY 47, 51; see, also, Johnson Corp. v Indemnity Ins. Co. of North Amer., 7 NY2d 222, 227.) It certainly would be expected that merchandise loaded into a vehicle, which arrived a short time before and is about to continue on after some unloading and loading, is "in transit loaded for shipment.” As stated in Pulitzer Creations v Phoenix Ins. Co. (47 Misc 2d 801, 804, supra): "In the final analysis, the outcome of a case such as this should be determined not by precise semantic shadings of terms of art, but by a common-sense appraisal of the over-all situation.” The commonsense viewpoint of the average person (see Lewis v Ocean Acc. & Guar. Corp., 224 NY 18, 21) would be that the tuxedos were "in transit loaded for shipment” when they were stolen, and the court so finds. Moreover, even if there were some ambiguity as to the meaning of this phrase, any such ambiguity is to be resolved in favor of the insured and against the insurer. (Sperling v Great Amer. Ind. Co., 7 NY2d 442, 450; Greaves v Public Serv. Mut. Ins. Co., 5 NY2d 120, 125; Tonkin v California Ins. Co., 294 NY 326, 328-329; Hartol Prods. Co. v Prudential Ins. Co., 290 NY 44, 49.)
2. Notice of loss. While the court finds that plaintiff gave defendant notice of loss within a reasonable time after the loss, the court cannot understand the basis of this defense. Unlike most insurance policies which contain provisions regarding notice of loss, the policy introduced in evidence in this case by plaintiff and stipulated by the defendant as the policy issued by the defendant, does not contain any such provision.
3. Breach of warranty. The policy contained an endorsement entitled "Theft Endorsement — With Alarm Protection Warranty” which included the following: "it is a condition precedent to the liability of the Insurer hereunder and to the effectiveness of this policy that the vehicles scheduled herein are equipped with the Safe-T-Alarm Co. Alarm System; that such Safe-T-Alarm Co. Alarm System shall be maintained in working order at all times, inspected and approved once every 30 days by the insured and/or any of its authorized representatives, and proper inspection records be made and *426 maintained”. Defendant has raised a defense claiming that there was a violation of this paragraph. Defendant, which attempted to prove this defense upon cross-examination of plaintiffs witnesses, did not raise any question concerning another paragraph of the warranty which related to the keeping of the alarm in the "on” position except while loading or unloading and keeping a man in attendance at such times. In any event, the uncontradicted testimony of plaintiffs driver was to the effect that the alarm was on when he left the vehicle.
While a defense based upon a breach of warranty apparently should have been pleaded as an affirmative defense (Black Co. v London Guar. & Acc. Co., 190 App Div 218, affd 232 NY 535), plaintiff made no specific objection concerning defendant’s failure to do so and did not claim surprise (see CPLR 3018, subd [b]). Accordingly, the court will consider the defense based upon the quoted endorsement, with defendant having the burden of proof. (Zeltner v Fidelity & Deposit Co., 220 App Div 21; Black Co. v London Guar. & Acc. Co., supra.)
This endorsement must be considered in light of section 150 of the Insurance Law. It is stated in subdivision 1 thereof: "The term 'warranty’ as used in this section, means any provision of an insurance contract which has the effect of requiring, as a condition precedent of the taking effect of such contract or as a condition precedent of the insurer’s liability thereunder, the existence of a fact which tends to diminish, or the non-existence of a fact which tends to increase, the risk of the occurrence of any loss, damage, or injury within the coverage of the contract.” The quoted endorsement, called a "warranty” by defendant, is clearly not a provision limiting coverage by excluding all but a stated risk (cf. Mobil Oil Corp. v Reliance Ins. Co., 69 Misc 2d 876, affd 39 AD2d 839), but is "an undertaking that some particular thing be * * * done” (see Grady v Concordia Fire Ins. Co., 267 NY 177, 180) and is a warranty within the meaning of the statute.
The effect of a breach of warranty is set forth in subdivision 2 of section 150 of the Insurance Law in which it is stated: "No breach of warranty shall avoid an insurance contract or defeat recovery thereunder unless such breach materially increased the risk of loss, damage or injury within the coverage of the contract.” As observed in Glickman v New York Life Ins. Co. (291 NY 45, 51): "in section 150 the Legislature *427 was seeing to it that a policy of insurance will not be avoided by proof of an immaterial 'breach of warranty.’”
In order to establish this defense, it is necessary for defendant to show the existence of a warranty, its breach and that such breach "materially increased the risk of loss.” The existence of the warranty is set forth in the quoted endorsement and consists of three parts: (a) the vehicle is equipped with Safe-T-Alarm Co. Alarm System; (b) this system be maintained in working order at all times and be "Inspected and Approved Once Every 30 Days”; and (c) "proper inspection records be made and maintained.” With respect to (a) and (b), defendant was completely unsuccessful in its attempt to prove a breach despite lengthy cross-examination of plaintiff’s witnesses which cross-examination seemed more like a deposition before trial under CPLR article 31. (Cf. Zeltner v Fidelity & Deposit Co., 220 App Div 21, 22-23, supra.)
Defendant was somewhat more successful regarding the making and maintaining of records. (Cf. Zeltner v Fidelity & Deposit Co., supra.) Here, at least, a question was raised concerning whether or not there was a breach. Plaintiff’s president at first testified that the only records kept were bills received from a service station when the vehicle was serviced. When his testimony continued the next day, he then said the driver took care of the records and he told the driver to keep the records in the glove compartment of the vehicle with the registration. The driver testified that he made a record of the inspections upon á sheet or sheets of paper which he kept in the glove compartment of the vehicle. These records could not be produced since they were in the glove compartment when the vehicle was stolen some time later.
That the records may have been kept on sheets of paper would not necessarily mean that they were not "proper inspection records” within the meaning of the endorsement. The policy did not specify what kind of records were to be kept. If defendant wanted a particular kind of record to be kept, it presumably would have so stated in the policy. Resolving any ambiguity in the meaning of "proper inspection records” against the insurer (Sperling v Great Amer. Ind. Co., 7 NY2d 442, 450, supra; Greaves v Public Serv. Mut. Ins. Co. 5 NY2d 120, 125, supra; Tonkin v California Ins. Co. 294 NY 326, 328-329, supra; Hartol Prods. Co. v Prudential Ins. Co., 290 NY 44, 49, supra), requires a finding that the keeping of the inspection records either on a sheet or sheets of paper or in the form *428 of bills, was proper and would comply with any requirements of the policy.
The seemingly contradictory testimony of plaintiffs president and driver concerning the form of the records, together with the claim that these records, important for the claim under the policy, were permitted to remain in the vehicle’s glove compartment where they disappeared when the vehicle was later stolen, raise some question as to whether any records were in fact "made and maintained.” However, it is unnecessary to resolve that question since, whether or not any records were made and maintained, no evidence was introduced to show that the absence of such records "materially increased the risk of loss.” Indeed, it is difficult to imagine how the presence or absence of records in and of themselves could have "materially increased the risk of loss.” Inspecting the alarm system and keeping it in working order would be important with respect to the risk of loss, but there was compliance with these requirements. It would appear that any failure to keep a record of inspections was just the kind of "immaterial 'breach of warranty’ ” which the Legislature had in mind in enacting section 150. (See Glickman v New York Life Ins. Co., 291 NY 45, 51, supra.) Accordingly, the court finds that the defense of breach of warranty has not been established.
4. Damages. In general, where one is in business and his stock in trade is lost or destroyed, the wholesale value of the merchandise is used as the basis for determining damages since that will be his replacement cost. (Dubiner’s Bootery v General Outdoor Adv. Co., 10 AD2d 923.) This measure of damages would be applicable to the plaintiff, which was in the business of selling and renting tuxedos.
Plaintiffs president testified that the value of the stolen tuxedos was $90 as to each black tuxedo, which had just been purchased, and was $81 as to each gray tuxedo, which had been purchased shortly before the theft. The claim of loss was $7,020 with respect to the black tuxedos and $810 with respect to the gray tuxedos, for a total of $7,830. Since the policy limit applicable to the vehicle was $5,000, any recovery is limited to $5,000.
Defendant apparently does not dispute this measure of damages but contends, with respect to the black tuxedos which had just been picked up by plaintiff’s driver from Haricon and which plaintiff’s president had never seen, that *429 the latter’s testimony is insufficient to prove value. Relying on the rule that "opinion evidence must be based on facts in the record and that an expert may not reach his conclusion by assuming material facts not supported by the evidence” (Stracher v Corning Glass Works, 39 AD2d 560, 561), defendant argues that plaintiff’s president improperly assumed that the tuxedos he ordered from Haricon were in fact the ones delivered to the driver.
Defendant, however, overlooks the fact that plaintiff’s president had "peculiar knowledge” of the value of tuxedos generally and therefore could give competent testimony concerning their value. (See Teerpenning v Corn Exch. Ins. Co., 43 NY 279, 282-283.) His testimony as to value was "not strictly a subject for expert testimony.” (Richardson, Evidence [10th ed], § 364, subd [n].) One with his expertise may certainly testify that a tuxedo had a value of $90. That he had not seen the particular tuxedos which were stolen may affect the weight of his testimony but not its admissibility. Moreover, even a valuation of something less than $70 a tuxedo, would result in a loss of $5,000 with respect to the black tuxedos alone. The court finds that the cash market value and the replacement cost of the black tuxedos amounted to at least $5,000 and that of the gray tuxedos amounted to $810.
Conclusion. The court directs judgment in favor of plaintiff against defendant in the amount of $5,000 with interest from October 12, 1973.