PALM DESERT NATIONAL BANK,
A NATIONAL BANKING AS-
SOCIATION, Plaintiff,

v.

FEDERAL INSURANCE COMPANY,
an Indiana corporation,
Defendant.

No. CV 04–7078GPSSSX.

United States District Court,
C.D. California.

Feb. 5, 2007.

Robert P. Beckham, S. Alan Rosen, Horgan Rosen Beckham & Coren, Calabasas, CA, for Plaintiff.

Gilbert D. Jensen, Jennifer Michelle Kokes, Musick Peeler & Garrett, Los Angeles, CA, for Defendant.

**ORDER DENYING PALM DESERT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING FEDERAL'S MOTION FOR SUMMARY JUDGMENT**

SCHIAVELLI, District Judge.

This case comes before the Court on Plaintiff Palm Desert National Bank ("PDNB") and Defendant Federal Insurance Company's ("Federal") motions for partial summary judgment and summary judgment, respectively. The parties have filed a stipulation of undisputed facts

("Joint Stip."), which both parties admit forms the core of the facts necessary to resolve the cross-motions.

## I. BACKGROUND

PDNB is a bank, headquartered in Palm Desert, California, that engages in the business of supplying "vault cash" to automated teller machines ("ATMs" or "ACMs") throughout the country. Federal is an insurance company that contracted (in the form of a financial institution bond) with PDNB to insure it against certain losses associated with this business. PDNB made the claim of loss involved here when it discovered that the armored car company that serviced its various ATMs, Tri–State Armored Services, Inc. ("Tri–State") had stolen approximately $50 million dollars. Because the process involved in servicing ATMs are critical to resolving the issues of contractual interpretation raised in these cross-motions, that process is set out in detail below.

In order to provide vault cash to the various ATMs it serviced in Pennsylvania, PDNB contracted with Tri–State to transport money to and from the ATMs and performed other balancing, settlement and maintenance services relating to the ATMs. (Joint Stip. at ¶ 3.) When an ATM needed more cash, third party ATM owners would advise PDNB, and PDNB would wire the required funds to its correspondent bank in the area, First Union National Bank ("First Union"). (Id., ¶ 5.) PDNB also would fax or e-mail Tri–State written instructions specifying which ATMs needed cash and in what amounts, and Tri–State accordingly would send an armored vehicle to First Union to retrieve the vault cash. (Id., ¶ 6.) Tri–State would then take the cash, which was arranged in "bundles," load it into the armored vehicle, drive it to the Tri–State office in a nearby strip mall, unload it, and place it in a "cash room." (Id., ¶ 6.) It was here that Tri–State would unbundle and sort the cash, and then place

it in the various ATM "cassettes" corresponding to the ATMs to which PDNB directed Tri–State. (Id., ¶ 7.)

Tri–State then would load the armored vehicle with the replenished ATM cassettes and drive to the various ATM locations. (Id., ¶ 8.) Upon reaching a particular ATM, Tri–State would unload the ATM cassette, extract the old ATM cassette, and replace it with the new cassette. (Id.) After servicing all depleted ATMs in this manner, Tri–State would transport the replaced cassettes back to its office and place them in the cash room. (Id., ¶ 10.) Inside this room, Tri–State employees would count the money remaining in each replaced cassette and compare that amount with the amount listed on the "tape" dispensed by the ATM when the cassette was removed. (Id.) Tri–State was entrusted to then make out a deposit slip for these remaining monies ("residual money"), load the slips and the residual money into the armored vehicle, drive back to First Union, and deposit the money into PDNB's account. (Id.) According to the Proof of Loss PDNB submitted to Federal, Tri–State stole PDNB's vault cash both by 1) failing to use PDNB's money to replenish ATMs, and 2) failing to deposit residual money back into PDNB's account at First Union. (Id., ¶¶ 12–13.)

On March 2, 2001, Tri–State filed for bankruptcy in New Jersey. (Id., ¶ 14.) In connection with the bankruptcy proceedings, several Tri–State employees testified to the theft of the money in question. In relevant part, the employees testified that: no money was stolen while inside an armored vehicle, but rather all thefts occurred inside Tri–State's office; Tri–State typically would gain custody of its customers' money either by direct deposit into Tri–State's account, by pick-up at a third party bank, or by check made payable to Tri–State; Tri–State's main office was lo-

cated in strip mall with no separate safes for storage of its customers' money; Tri–State would unbundle and sort its customers' money on a table, on the floor, and in plastic tubs in a separately locked room; all customers' funds were commingled. (*Id.*, ¶¶ 19–23.)

The Tri–State employees further testified that starting as early as 1998, Tri–State officers "borrowed" customers' money for deposit in their personal accounts and in Tri–State's corporate accounts used for operating and payroll expenses. (*Id.*, ¶¶ 24–25.) Moreover, the employees testified that Tri–State would cover shortages claimed by one of their customers by using funds of another customer, and that this practice resulted in a constant shortage of money necessary to fill ATM cassettes. (*Id.*, ¶¶ 26–27.) Finally, Tri–State employees often would alter balance sheets they provided to their customers in order to conceal the shortages resulting from their thefts. (*Id.*, ¶ 28.)

At the outset of the bankruptcy case, pursuant to an order of the bankruptcy court, Tri–State's strip mall office was searched and $19.7 million was recovered. (*Id.*, ¶ 15.) However, the money was commingled and therefore it was impossible to determine to which of the approximately 60 customers of Tri–State the money belonged. (*Id.*) Approximately 60 different banks filed claims with the bankruptcy court totaling in excess of $50 million. (*Id.*, ¶ 16.)

After Federal denied PDNB's $1,528,780 claim, PDNB filed a complaint against Federal for 1) breach of contract, 2) breach of the implied covenant of good faith and fair dealing, and 3) declaratory relief,[1] seeking damages of $1,590,472.95. PDNB also filed a claim in the bankruptcy proceeding for $1,536,500, and received a payout of $551,196.14. (*Id.*, ¶ 17.) Therefore, PDNB's current claim against Federal is for the difference between its claimed loss and its recovery, $977,583.90, plus costs of $61,692.95.

## II. DISCUSSION

On a motion for summary judgment, the moving party has the burden of establishing the nonexistence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 330, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). To meet this burden, the moving party either may submit evidence that negates an essential element of the nonmoving party's claim or may demonstrate that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim. *Id.* This showing may utilize pleadings filed by the opponent, depositions, answers to interrogatories, admissions, and affidavits made on personal knowledge and setting forth facts admissible in evidence (although the facts need not be presented in admissible form). *Id.* at 324, 106 S.Ct. 2548.

Summary judgment is not proper if a genuine dispute of material fact exists. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The material fact must have sufficient evidentiary support. Thus, "[t]he mere existence of a scintilla of evidence" is not sufficient to defeat a motion for summary judgment; the evidence must be sufficient to support a reasonable jury determination in favor of the nonmoving party. *Id.* at 252, 106 S.Ct. 2505.

### A. Cross–Motions for Summary Judgment on Claims 1 and 3

PDNB and Federal both move for summary judgment on PDNB's first claim for

---

1. PDNB's claim for declaratory relief simply seeks a declaration that each of its claims for relief is meritorious, that is, a declaration that its loss is a covered loss and that Federal handled its claim in bad faith.

breach of contract and its third claim for declaratory relief, both of which address the central issue in the case, whether PDNB's loss is covered under the applicable clauses of the bond.

### 1. Applicability of Insuring Clause 3

The central coverage issue disputed by the parties turns on the interpretation of Insuring Clause 3 of the bond. In relevant part, that clause insures against:

3. Loss of **Property** resulting directly from common law or statutory larceny, misplacement, mysterious unexplainable disappearance, damage or destruction, while the **Property** is in transit anywhere:

A. in an armored vehicle, including loading and unloading thereof,

B. in the custody of a natural person against as a messenger of the ASSURED [PDNB], or

C. [not relevant here]

Coverage under this INSURING CLAUSE begins immediately on the receipt of such **Property** by the natural person ... and ends immediately on delivery to the premises of the addressee or to any representative of the addressee located anywhere.

(Joint Stip., Ex. B at PDNB–0004) (Emphasis in original.) Therefore, in order for PDNB's loss to be considered under one of the subsections of Insuring Clause 3, i.e., Clause 3A or 3B, first the loss must 1) involve "property," 2) result "directly" from larceny or under the other enumerated conditions, and 3) occur while the property is "in transit."

#### a. "Property"

The "vault cash" that constitutes the claimed loss here clearly qualifies as "property" under Insuring Clause 3, and the parties do not dispute this issue. (Joint Stip., Ex. C, PDNB 0024–0025) ("XX. **Property** means any **Money**; ....";

"QQ. **Money** means a medium of exchange in current use authorized or adopted by a domestic or foreign government as part of its currency.")

#### b. "Direct" Loss Resulting from Larceny, Misplacement, etc.

Given the testimony of Tri–State's employees in the bankruptcy proceeding, the parties do not dispute that Tri–State's theft constitutes the required larceny, misplacement, unexplainable disappearance, etc. required for coverage under Insuring Clause 3. Therefore, the only issue remaining in this regard is whether PDNB's loss was a "direct" result of that theft.

In contesting PDNB's claim of loss, Federal asserts that because Tri–State commingled its various customers' funds, "it is impossible for PDNB to establish whether the claimed loss, in whole or in part, represents the actual loss of currency ..." suffered by PDNB. (Opp. at 14–15.) In support of this contention, Federal offers an interrogatory response made by PDNB on July 11, 2003, in which PDNB stated that, at that stage in discovery, it did not "know precisely" how or when its funds were stolen by Tri–State. (Joint Stip., ¶ 43.) On the other hand, PDNB states that it has identified the lost cash with reasonable particularity to establish that its loss was a direct result of Tri–State's undisputed theft. Specifically, "PDNB identified, in its Proof of Loss, each undelivered or unreturned cash shipments [sic]. Each transaction was identified and back up detail provided in the Proof of Loss. [See Ex. '3' and Ex. '3A' to Swanson Declaration]."

It is difficult to imagine how PDNB could establish its loss any more thoroughly than it already has, or establish any more clearly that Tri–State's theft *directly* caused the loss. PDNB's Executive Vice President and Chief Financial Officer

Rhonda Swanson submitted a declaration in support of PDNB's motion ("Swanson Decl.") in which she detailed PDNB's claimed loss. Specifically, she first summarized PDNB's claim by listing, by ATM terminal location, the amounts of funds missing, the date the funds were missing, and the manner in which Tri–State wrongfully withheld the funds. (Swanson Decl., Ex. 3.) For example, at terminal "DN0145" at Clearview Mall in Pennsylvania, PDNB claimed two separate losses ($10,000 and $540) on February 21, 2001. (*Id.*) PDNB also listed the manner in which each sum of money was stolen—"Cash order not placed in machine" for the $10,000, and "Cash swap not returned to PDNB" for the $540. (*Id.*) PDNB accounted for all claimed funds in this manner.

■ Further, Swanson's declaration goes on to provide documentation to support these claimed losses, including checking account statements and wire transfer receipts attesting to the missing funds. (*Id.*, Ex. 3A.) The documents show, for example, that Tri–State failed to replenish ATM cassettes in certain locations when PDNB provided Tri–State with the instructions and vault cash to do so, or that surplus cash remaining from ATM cassettes was not redeposited into PDNB's account. Therefore, PDNB has established that its claimed loss resulted "directly" from Tri–State's theft.

### c. "In Transit"

The central issue in determining whether PDNB's claimed loss qualifies under Insuring Clause 3 is whether the loss of property occurred "in transit" under California law.[2] PDNB argues that the funds were "in transit" from the time they left First Union until they reached their destination when Tri–State replenished the ATMs or returned the residual cash to First Union. (Mot. at 14.) Federal claims that because it is stipulated that the thefts occurred inside Tri–State's office, where the funds were sorted, they did not occur "in transit." (Opp. at 8.)

As a starting point, Black's Law Dictionary defines "transit" as "1. the transportation of goods or persons from one place to another. 2. Passage; the act of passing." Black's Law Dictionary (8th ed.2004). Only one California case, *Aetna Cas. & Sur. Co. v. Burbank Generators, Inc.*, 121 Cal.App.3d 813, 816, 175 Cal.Rptr. 568 (1981) has interpreted the words "in transit" in the context of an insurance policy like that at issue in this case.[3] In *Aetna,* the insured drove certain cargo to a nearby locked parking area in the early evening and left it there, where it would be picked up by its drivers at 2 a.m. the following morning. However, the cargo was stolen before the drivers could reach it, and the insured filed a claim with its inland marine carrier. The claim was denied, and the insured filed suit. The court held that when the cargo was stolen, it was still "in transit" within the meaning of the policy, because the transportation of the cargo to the parking lot in anticipation of the drivers' arrival constituted just one part of a multi-leg journey to Northern California, and thus the theft occurred while the cargo was "in the ordinary

---

2. California state substantive law governs because the Court's jurisdiction is based on diversity of citizenship.

3. The Ninth Circuit's opinion in *Exch. Lemon Prods. Co. v. Home Ins. Co.*, 235 F.2d 558, 561 (9th Cir.1956) is not useful in this regard. There, the court interpreted a provision covering losses incurred "in due course of transit and not if such property is in storage," but did not offer any reasoning to support its paradoxical holding that the goods "probably were" in transit but also were "in storage" when damaged by a flood. *Id.* Moreover, it was not clear that the court interpreted the provision at issue under California law or federal law.

course of transportation." *Id.* at 816, 175 Cal.Rptr. 568. The court stated that "a merely temporary interruption of actual transportation for purposes related to the carriage itself does not remove the property from transportation." *Id.* (*quoting* "Insurance Coverage 'In Transit,'" 80 A.L.R.2d 445, 450) (Emphasis added.) However, the court also noted that when the cargo was left in the parking lot, no "further work" was to be done on it before it was ready for the drivers to continue their transport. *Id.* In this way, the court suggested that transit might have been broken had such "further work" been done, highlighting the distinction between temporary stops and stops involving "further work" that is central to determining when a transit is "broken."

Other jurisdictions are split as to the nature of the "break" necessary to remove the loss from "in transit" coverage. PDNB mainly relies on New York cases, which adopt a broad definition of "in transit" provisions. For example, in *Irv–Bob Formal Wear, Inc. v. Public Serv. Mut. Ins. Co.*, 81 Misc.2d 422, 366 N.Y.S.2d 596, 598–599 (1975), the plaintiff claimed an "in transit" loss where its employee picked up tuxedos from its facility, made several stops at its various retail stores to distribute them, and returned from inside one store to find the rest of the tuxedos stolen from the vehicle. The court held that "by any meaningful definition of 'in transit,' the black tuxedos were in transit when they were stolen" at the stop. *Id.* at 599. The court declined to adopt a "narrow construction" of transit as "actual movement, and not a period of rest," commenting that "the movement of these tuxedos was merely temporarily interrupted when the vehicle stopped at the Far Rockaway store." *Id.* Thus, the relevant inquiry in the New York cases is "whether the goods, even though temporarily at rest, were still on their way, with the stoppage being merely incidental to the main purpose of

delivery." *Id.* Or, put another way, whether the stoppage of the goods "[i]s consistent with the continuing transit, and [i]s not a deviation or bypass for the [deliverer's] own convenience." *Ben Pulitzer Creations, Inc. v. Phoenix Ins. Co.*, 47 Misc.2d 801, 263 N.Y.S.2d 373, 376 (1965).

On the other hand, Federal relies on the narrower construction of "in transit" provisions given by Texas courts. In *U.S. Fid. & Guar. Co. v. Hutson Constr. Co., Inc.*, 544 S.W.2d 762, 764 (Tex.Civ.App.–Dallas 1976), the court held that "in transit" means "literally in the course of passing from point to point," and accordingly denied coverage where copper wiring, delivered to plaintiff's warehouse and awaiting transportation to construction sites where it was to be used, was stolen. *Hutson* followed *Simons v. Niagara Fire Ins. Co.*, 398 S.W.2d 833, 834 (Tex.Civ.App.-Fort Worth 1968), where the court denied coverage for grain stolen from an elevator storage facility awaiting delivery to the plaintiff, based on its view that the word transit "has a significance of activity, of motion and of direction."

The Court declines the parties' invitations to adopt wholesale the New York or Texas rules. Though there is only one reported case in California that addresses the meaning of the phrase "in transit" that case provides the proper standard. *Aetna* suggests that the Court must determine whether Tri–State's stop at its office to unbundle and sort the vault cash was "merely an interruption of actual transportation for purposes related to the carriage itself," or a break in transit to perform "further work" on the cargo. *Aetna*, 121 Cal.App.3d at 816, 175 Cal.Rptr. 568. Again, although the *Aetna* court found that the loss there was covered, it suggested that a different result might obtain if "further work" were to be performed on the cargo when it was placed in the parking

lot. *Id.* In this way, the court distinguished cargo ready to be delivered from cargo in a form not suitable for delivery. *Id.* ("The stop was not made so that any further work might be done by Burbank on the cargoes . . . .").

Here, the undisputed facts show that during the course of its deliveries, Tri–State would perform "further work" on its cargo, because it was not in a form suitable for delivery. First, Tri–State would obtain cash from First Union, transport it to its office, unbundle and sort the cash according to how much cash each ATM needed, and then leave the office to distribute the cash to the various ATMs. (Joint Stip., ¶¶ 5–10.) In other words, it is undisputed that when Tri–State obtained cash from First Union, the cash was not in a form suitable for distribution to the various ATMs and therefore required "further work."

Similarly, the cash coming from the ATMs to be deposited at First Union required "further work" before it was delivered. It is undisputed that after servicing the ATMs, Tri–State would transport all replaced cassettes back to its office where Tri–State employees counted the money remaining in each replaced cassette, compared that amount with the amount listed on the "tape" dispensed by the ATM, and made out a deposit slip for this residual money. (*Id.*, ¶ 10.) It was not until *all* of these steps were complete that the residual money could be transported by armored car to First Union to be deposited in PDNB's account. (*Id.*)

Under *Aetna*, these stops at Tri–State's office break the "transit." Regardless of the duration of the money's stay in Tri–State's office, the stops were not mere temporary breaks,[4] but critical stops to complete work without which Tri–State's cargo could not be delivered. In this sense, Tri–State participated in the production of the cargo, performing substantial work to prepare it for delivery. It was not until the cash was segregated and placed in the cassettes, or taken from the cassettes and counted, that the cargo was ready for delivery. Under this Court's reading of *Aetna*, it is only after the work was done that "transit" resumes.

The parties have not cited to, nor has the Court found, any authority involving facts analogous to those presented here. First, the facts here are distinguishable from those in *Aetna* in the sense that Tri–State did not simply pick up the cargo and proceed to the destination, like the drivers did in *Aetna*. *Aetna*, 121 Cal.App.3d at 816, 175 Cal.Rptr. 568. Rather, in *Aetna*, the cargo left in the parking lot was ready for commercial delivery at the time it was placed there-it did not require alteration by the drivers scheduled to pick it up the following morning. *Id.* Therefore, this case presents precisely the type of situation the *Aetna* court excluded from the scope of its holding when it suggested that no coverage would exist if "further work" were done on the cargo in the course of transit.

In this regard, *Koshland v. Columbia Ins. Co.*, 237 Mass. 467, 473, 130 N.E. 41 (1921), also highlights the distinction between a stop merely incidental to delivery of goods and a stop undertaken to perform further work on the goods. There, the Supreme Judicial Court of Massachusetts found that uncleaned wool sent to a scouring mill for cleaning and grading before commercial delivery was not "actually in transit" when it was damaged by a flood-

---

**4.** While it is not clear from the papers submitted by the parties exactly how much time typically was spent in Tri–State's office unbundling and sorting the cash, at oral argument counsel for PDNB did not dispute Federal's counsel's assertion that Tri–State's preparation could take up to 24–36 hours.

ing of the mill. *Id.* at 470, 477, 130 N.E. 41. And, although the relevant insurance clause in that case contained the word "actually," the court, in denying coverage, found it significant that "[t]he main purpose of th[e] stoppage [wa]s to prepare the wool for market rather than as a simple incident of movement across the country." *Id.* at 473, 130 N.E. 41. Again, here the stop at Tri–State's office was not merely incidental to the delivery, but rather was a necessary stop without which the "cargo" would not be deliverable and transfer could not be completed.

Thus, as it stands none of the cases discussed by the parties address whether there would be coverage under an "in transit" provision if cargo not suitable for immediate, direct delivery were taken from the sender to a neutral site, where substantial work was performed on the cargo in order to prepare it for delivery. Rather, the Court's conclusion is based on the reasoning of *Aetna*, persuasive cases from other jurisdictions, and the facts presented here that distinguish this case from those cited.[5]

██ Therefore, the Court finds that because the goods were not in transit when they were at Tri–State's office, and it is undisputed that all thefts occurred there, PDNB's cash was not "in transit" when it was stolen. This conclusion does not depend on whether there were one or two periods of "transit" here. In other words,

if the first period of transit commenced with Tri–State's collection of vault cash from First Union, and the second period with Tri–State's departure from its office for the purpose of delivering the vault cash, the stop at the office broke the transit. On the other hand, if the process of replenishing ATMs involved but one continuous transit, that is, from Tri–State's collection of the vault cash to its final delivery of residual money to First Union, it is equally true that the stop at the office took the goods out of "transit."

Accordingly, PDNB's motion for partial summary judgment is **DENIED**, and Federal's motion for summary judgment is **GRANTED** as to PDNB's first and third claims for relief. In light of the foregoing, the Court need not reach the issue of coverage under Insuring Clauses 3A or B, because coverage under those clauses is predicated on a finding that the loss occurred "in transit."

### 2. Coverage of Expenses Incurred by PDNB to Determine the Amount of the Loss

Under Insuring Clause 22B of the bond, Federal agreed to provide coverage for

B. Reasonable expense incurred by the ASSURED, solely for independent firms or individuals retained to determine the amount of loss, where:

(1) the loss is covered under the Bond, and

---

5. One final factor, though not necessary to the Court's decision, also must be considered— the scope of risk anticipated by Federal in issuing the bond to PDNB. *See Cal. Cas. Ins. Co. v. Northland Ins. Co.*, 48 Cal.App.4th 1682, 1692, 56 Cal.Rptr.2d 434 (1996) (cautioning against binding an insurer to a risk that it did not contemplate and for which it has not been paid). Unfortunately, nothing in the record directly bears on this factor. However, it appears from a review of the remaining portion of Insuring Clause 3, specifically subpart A, that Federal only contemplated insuring against those losses occurring in transit *and* in an armored vehicle. (*See* Jt. Stip., Ex. B at PDNB–0004) (subpart A to Insuring Clause 3 provides coverage for losses occurring in transit "in an armored vehicle, including loading and unloading thereof.") Thus, subpart A of Insuring Clause 3 strongly suggests that Federal did not contemplate assuming the risk for the loss that occurred here and therefore adds further support for this Court's ultimate conclusion as to the meaning of "in transit."

(2) the loss is in excess of the applicable DEDUCTIBLE AMOUNT.

(Joint Stip., Ex. B at PDNB–0013.) Because the loss is not covered by the bond, subsection (1) is not satisfied and PDNB's expenses are not covered under the bond.

### B. Federal's Motion for Summary Judgment on Claim 2

Federal seeks summary judgment as to PDNB's second claim for breach of the implied covenant of good faith and fair dealing. Because there is no coverage, and thus no breach of contract, the bad faith claim must fail. *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1153, 271 Cal. Rptr. 246 (1990). Therefore, Federal's motion for summary judgment as to the second claim for relief is **GRANTED**.

### III. CONCLUSION

In light of the foregoing, PDNB's motion for partial summary judgment as to the first and third claims should be **DENIED**, and Federal's motion for summary judgment as to all three claims for relief should be **GRANTED**.

**IT IS SO ORDERED.**