**J & H AUTO TRIM COMPANY, INC., Plaintiff,**

v.

**BELLEFONTE INSURANCE COMPANY, California Union Insurance Company, Underwriters at Lloyd's London, Sphere Insurance Company, Ltd., Canadian Universal Insurance Company Limited, Defendants.**

**No. 76-933 Civ. T-K.**

United States District Court, M. D. Florida, Tampa Division.

Nov. 3, 1980.

---

D. Russell Stahl, David A. Maney, Tampa, Fla., for plaintiff.

William A. Gillen, Fowler, White, Gillen, Boggs, Villareal & Banker, Tampa, Fla., for defendants.

## MEMORANDUM OPINION

KRENTZMAN, District Judge.

In this diversity case, the plaintiff, J & H Auto Trim Company, Inc., was the owner of certain vinyl auto tops which were destroyed by fire in February 1976. The vinyl auto tops, along with other goods, had been purchased by the plaintiff's predecessors for the aggregate sum of $10,000.00 in November, 1975. Prior to such loss, the plaintiff's predecessors or the plaintiff had applied for and each of the defendants had issued a policy insuring the vinyl auto tops against loss by fire. The aggregate amount of coverage provided by the five policies was

$280,800.00. The plaintiff sued the defendants seeking to recover the aggregate coverage, plus interest, costs and a reasonable attorney's fees.

The case was first tried in January 1980 before Honorable Richard E. Robinson, of Omaha, Nebraska, a Senior Judge, sitting by special assignment, and a jury. The jury was required to return a special verdict and to answer certain written questions concerning the issues. By its special verdict, the jury found that the defendants had not proved any of their three affirmative defenses, and that the actual cash value of the destroyed vinyl auto tops was the sum of $345,925.00. The defendants moved for a new trial. After considering written memoranda and hearing oral arguments of counsel for the respective parties, the Court rendered a memorandum opinion specifying its grounds for granting a new trial, and entered an order sustaining the defendants' motion for new trial.

The case was tried a second time before the undersigned Judge and a jury in July 1980. At the close of all of the evidence, the defendants moved for a directed verdict in their favor upon each of their three affirmative defenses, and limiting the plaintiff's damages, if any, to the sum of $10,000.00, which amount the defendants contended the evidence showed to be the maximum actual cash value of the insured property at the time of the loss or the replacement cost of the insured property within a reasonable time after the loss. The Court denied the motion, but expressly stated that the action would be submitted to the jury, subject to a later determination by the Court of the legal issues raised by the motion for directed verdict.

Again the jury was instructed to return a special verdict, based upon a preponderance of the evidence, answering four written questions which covered the issues in the case.

Question 1 was as follows:

1. Have the defendants proved that in applying for the insurance policies in this case the plaintiff made any misrepresentations or concealed any fact which was either fraudulent or material to the acceptance of the risk by defendants or was such that in good faith the defendants would not have issued the respective policies in the amounts they did if the true facts had been known to them? (Answer Yes or No)

The jury answered "No."

Question 2 was as follows:

2. Have the defendants proved that the plaintiff intentionally burned, caused or procured the burning of the insured property? (Answer Yes or No)

The jury answered "No."

Question 3 was as follows:

3. Have the defendants proved that plaintiff wilfully misrepresented the value of the insured personal property damaged or destroyed in completing the proofs of loss or inventory submitted as a part thereof, or when plaintiffs' representatives were examined under oath after the loss? (Answer Yes or No)

The jury answered "No."

Question 4 was as follows:

4. What was the "actual cash value" of the insured personal property damaged or destroyed by the fires involved in this case as of the date of such fires?

The jury answered "$165,000.00."

The defendants timely filed post–trial motions for a judgment notwithstanding the verdict and for a new trial. The respective parties submitted written memoranda in support of and in opposition to such motions, and the Court heard oral statements and arguments by counsel for the respective parties.

The Court measured the defendants' motion for judgment notwithstanding the verdict by the standard enunciated in *Boeing Co. v. Shipman*, 411 F.2d 365, 374–375 (5th Cir. 1969) (en banc), and subsequent decisions re–affirming said standard, including *Spurlin v. General Motors Corp.*, 528 F.2d 612, 614–619 (5th Cir. 1976) and *Maxey v. Freightliner Corp.*, 623 F.2d 395, 397 (5th Cir. 1980).

In *Boeing Co. v. Shipman, supra*, the court said, at 411 F.2d 374–375:

On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence–not just that evidence which supports the non–mover's case–but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair–minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n.o.v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses. (Footnotes omitted)

■ At this point, the Court feels it important to state that, during the second trial, the Court erroneously and improperly admitted into evidence, over the defendants' objections, and permitted the jury to consider in reaching its special verdict, certain testimony of John Jackson, a witness for the plaintiff, concerning the prices for which small quantities of the vinyl auto tops had been sold in isolated sales prior to the fires involved herein, and concerning the prices for which the remainder of the tops could have been sold in small quantities in isolated sales over a long period of time had their destruction by fire not occurred. The Court also erroneously denied the defendants' motion, made after the close of all of the evidence, to strike said testimony of Mr. Jackson, and failed to instruct the jury to disregard such testimony.

Mr. Jackson and James Harris were the predecessors and organizers of the plaintiff, and were the latter's sole stockholders, directors, officers and managers. The aforementioned testimony of Mr. Jackson was unsupported and self–serving, and, in the opinion of the Court, was not relevant and substantial evidence sufficient to create a jury question as to the actual cash value of the insured vinyl auto tops as a stock of merchandise, either at the time of the applications for the insurance policies involved herein or at the time of the loss of the vinyl auto tops by fire. In the opinion of the Court, the aforementioned testimony of Mr. Jackson was not within the scope of the evidence which was properly before the jury in reaching its special verdict.

■ In measuring the defendants' motion for judgment n.o.v., all of the evidence was considered–-not just that evidence which supported the plaintiff's case–but in the light and with all reasonable inferences most favorable to the plaintiff, but no weight was given to the aforementioned testimony of Mr. Jackson. The facts and inferences disclosed by the admissible evidence pointed so strongly and overwhelmingly in favor of the defendants with respect to Questions 1, 3 and 4 set forth in the special verdict that the Court believed that reasonable men could not arrive at a contrary verdict with respect to those questions. Further, the Court was of the opinion that, with respect to each of those three questions, there was no conflict in substantial evidence to create a jury question. Therefore, the Court entered its order granting the defendants' motion to set aside the jury's responses to Questions 1, 3 and 4 of the special verdict, and granting the defendants' motion for judgment notwithstanding the verdict with respect to the defenses and the issues covered by those questions.

After considering all of the evidence and measuring the same by the rule enunciated in the *Shipman* case, the Court believed that there was substantial evidence to create a jury question with respect to the defense and issue covered by Question 2 of the special verdict. Accordingly, the Court did not grant the defendants' motion for judgment notwithstanding the verdict with respect to Question 2.

The Court measured the defendants' motion for new trial by the standards set forth in *Cities Service Oil Co. v. Launey*, 403 F.2d 537, 540 (5th Cir. 1968); *O'Neil v. W. R. Grace & Co.*, 410 F.2d 908, 913–915 (5th Cir. 1969); *National Car Rental System, Inc. v. Better Monkey Grip Co.*, 511 F.2d 724, 730–31 (5th Cir. 1975); *Spurlin v. General Motors Corp.*, 528 F.2d 612, 620 (5th Cir. 1976), *supra; Conway v. Chemical Leaman Tank Lines, Inc.*, 610 F.2d 360, 362–363 (5th Cir. 1980), and thereafter felt that the motion should be granted upon several grounds.

The Court reviewed all of the evidence, and concluded that each answer of the jury to the four questions contained in the special verdict was against at least the great weight of the evidence, and would result in a miscarriage of justice.

It also was the opinion of the Court that other grounds existed for granting the motion, including (1) improper and prejudicial statements by and conduct of counsel for the plaintiff, (2) the improper admission into evidence by the Court of the aforementioned testimony of Mr. Jackson, (3) the error of the Court in denying the defendants' motion, made after the close of all the evidence, to strike such testimony of Mr. Jackson, and in failing to instruct the jury to disregard such testimony, (4) the jury's evaluation of the actual cash value of the vinyl auto tops was excessive, (5) reasonable grounds to believe that the jury's answers to each of the four questions contained in the special verdict were the result of sympathy, prejudice, the giving of undue weight to improperly admitted evidence, mistake, confusion, disregard of the Court's jury instructions, or other improper cause and (6) the fact that, because of the other grounds mentioned in this paragraph, the special verdict would result in a miscarriage of justice.

Upon the grounds stated above, the Court entered its order conditionally granting the defendants' motion for new trial in the event the Court's order granting the defendants' motion for judgment notwithstanding the verdict as to Questions 1, 3 and 4 of the special verdict should be vacated or reversed.

In a written order, filed August 21, 1980, clarifying certain verbal rulings made by the Court at the hearing held August 18, 1980, on defendants' post–trial motions, the Court stated it reserved the right to and would supplement its order with a memorandum opinion upon the entry of which the Clerk would be given appropriate instructions. Accordingly, the Court has prepared this memorandum opinion.

## THE ACTUAL CASH VALUE OF THE VINYL AUTO TOPS

The "actual cash value," in money, of the vinyl auto tops on various specific occasions, beginning in late November 1975, and ending on February 10, 1976, the date of their final destruction by fire, was a relevant and essential fact or issue to be considered by the jury in answering each of the four questions propounded in the special verdict.

Such value was particularly important on the occasions (1) in late November 1975, when the plaintiff's predecessors purchased the tops and other goods in a bulk sale for $10,000, (2) in mid December 1975, when fire insurance coverage on the tops in the amount of $180,000 was applied for and issued, (3) in early February 1976, when an increase in the fire insurance coverage to $280,800 was applied for and issued and (4) when, on the nights of February 9 and 10, 1976, successive fires, each of incendiary origin, destroyed the tops.

### The Evidence

The vinyl auto tops involved in this action were manufactured from rolls of different colored and kinds of vinyl materials and

were made to be installed with glue on the metal roof tops of automobiles. Some of the tops were manufactured by Pop's Top Shop, Inc., of Athens, Georgia, during the years· preceding April 30, 1975. The rest were manufactured by Pop's Vinyl Tops, Inc., of Athens, Georgia, between May 1, 1975, and late November 1975.

On April 30, 1975, Pop's Top Shop, Inc., in a bulk sale, sold all of its assets to Pop's Vinyl Tops, Inc., a new business enterprise. The Sale Closing Statement (Defts' Ex. 14) and the Promissory Note and Security Agreement (Defts' Ex. 15) relating to that transaction describe the property purchased and sold as follows:

| | |
|---|---|
| 8,478 Vinyl Roofs at $3.00 each | $25,434.00 |
| 17,080 Yards of Vinyl | $19,320.00 |
| Equipment | $24,050.00 |
| Office Equipment | $ 1,000.00 |
| Use of Trade-name | $ 2,000.00 |
| Boxes, Miscellaneous Merchandise; | |
| Dyes and Clips | $ 3,196.00 |
| Total | $75,000.00 |

"EXHIBIT A" attached to the Promissory Note and Security Agreement itemized the vinyl roof tops, yards of vinyl, office equipment, use of trade–name, boxes, miscellaneous merchandise, dyes and clips involved in the transaction. However, said exhibit did not itemize, mention or attribute any value to certain vinyl (plastic) roof moldings and chrome auto roof moldings which were included in the sale.

A few days after Thanksgiving, 1975, Messrs. John Jackson and James Harris, both of Tampa, Florida, and the plaintiff's predecessors, made a trip to Athens, Georgia, for the purpose of purchasing, in a bulk sale, some pre–made vinyl auto tops from Pop's Vinyl Tops, Inc. After arms' length negotiations, Messrs. Jackson and Harris offered to purchase a large quantity of vinyl auto tops and certain other items for the aggregate sum of $10,000, and Pop's Vinyl Tops, Inc., accepted the offer.

Pop's Vinyl Tops, Inc., was selling and Messrs. Jackson and Harris were buying basically vinyl auto tops, but in order to close the deal, the seller threw in certain other items, including some glue, chrome moldings (some of which had been damaged in a 1973 fire), rolls of vinyl material (some of which were damaged in same fire) and vinyl (plastic)· roof moldings (Lloyd Tr. 32). The transaction was a good deal for all concerned (Lloyd Tr. 7).

In connection with said sale, Pop's Vinyl Tops, Inc., prepared, on the stationery of Pop's Top Shops, Inc., Purchase Order No. 001495 (Defts' Ex. 16), in which the merchandise sold was described as follows:

All obsolete roofs (@ 12,000)
@ 200 cans Ford Glue
Chrome
@ 75 Rolls of material
Ford LTD & Torino Moulding $10,000.00

(Underscoring supplied).

An obsolete roof top was defined as one that was for auto models 2, 3 or 4 years old or older (Lloyd Tr. 7–8). The roof tops and other items sold to Messrs. Jackson and Harris not only were obsolete, but were for automobile models from 1968 through 1974, although there were some tops for 1975 models involved in the sale (Lloyd Tr. 24). Pop's Vinyl Tops, Inc., kept more of the current model roofs, because they were the faster movers, helped with cash flow and enabled the manufacturer to buy new vinyl roll goods with which to make tops for the current 1975 model cars (Lloyd Tr. 10). The tops for older model cars were slow sellers.

In November 1975, sales of 1975 model tops had increased to 60–70% of all sales, and sales for 1974 models had fallen off to under 50% of sales (Lloyd Tr. 23–24). By late November 1975, the 1976 automobiles were on the market, and tops for autos for that year began to become the current models.

The vinyl (plastic) mouldings (moldings) described in the Purchase Order simulated metal moldings on certain models of Ford automobiles (Lloyd Tr. 28–29). Pop's Vinyl Tops, Inc., sold very few of the vinyl (plastic) roof moldings. There was a certain demand for plastic moldings, but such demand was not tremendous. Chrome or aluminum moldings were more universally in use, and were used in about 90% ·of all installations, including those by Pop's Vinyl Tops, Inc. (Lloyd Tr. 31–33).

The merchandise sold to Messrs. Jackson and Harris comprised about 25% of the total inventory of Pop's Vinyl Tops, Inc., and the latter had about three times as much merchandise left after the sale as prior thereto (Lloyd Tr. 22). The obsolete tops remaining on hand did not sell quickly. As late as July 22, 1980, during the second trial, Pop's Vinyl Tops, Inc., still had on hand some of the obsolete vinyl auto roof tops and roll materials of the kind which had been sold to Messrs. Jackson and Harris in November 1975, but a large percentage of the obsolete roof tops had been sold over the intervening four years and eight months in quantities of up to twenty at a time or in orders from one to fifty (Lloyd Tr. 10–12).

After purchasing the aforementioned materials from Pop's Vinyl Tops, Inc., Messrs. Jackson and Harris moved the same from Athens, Georgia, to Tampa, Florida. Initially, the tops were stored at the place of business of Sporty Top Shops, Inc., of which Mr. Jackson was the sole stockholder or owner. A short while later, and by about mid–December, 1975, the tops, chrome moldings and vinyl (plastic) roof moldings were transferred to and stored in three rooms of a five room one–story building situated at 10001 Nixon Avenue, near Tampa, Florida, owned by Mr. and Mrs. Harris.

On December 16, 1975, the vinyl auto tops only were insured by Messrs. Jackson and Harris against loss by fire and other perils in the aggregate amount of $180,000.

On or about January 29, 1976, the Articles of Incorporation of the plaintiff, J & H Auto Trim Company, Inc., were filed in the Office of the Secretary of State of Florida.

On February 4, 1976, the insurance on the vinyl auto tops was increased by the plaintiff to the aggregate sum of $280,800.

On February 6, 1976, Messrs. Jackson and Harris executed and delivered to the plaintiff a bill of sale which stated that they transferred to the plaintiff 13,250 pre–made vinyl tops for automobiles which they had purchased in November, 1975 in Athens, Georgia, and which tops they estimated to be of the value of $239,125.00 wholesale to dealers who needed and used this type of material, and 15,000 sets of vinyl belt moldings, which they valued at $720,000.00 for sale to dealers in this type of material, an aggregate of $959,125, in exchange for the stock in the corporation which was to be issued 50% to Mr. Jackson and 50% to Mr. Harris (Defts' Ex. 18).

On the night of February 9, 1976, the Harris' building on Nixon Avenue was partially damaged by a fire of incendiary origin. There was little, if any, damage to the stored roof tops and other materials resulting from that fire. However, on the following night, February 10, 1976, a second and separate fire, also of incendiary origin, destroyed the Harris' building and its contents, including the roof tops and other stored materials.

After the fires, the plaintiff rendered to each insurer a sworn statement in proof of loss, dated April 5, 1976, wherein the plaintiff stated that, at the time of the destruction by fire of the insured property, the actual cash value thereof was the sum of $345,925, and wherein the plaintiff claimed its loss was the sum of $280,800, the aggregate amount of the fire insurance coverage provided by the five policies (Pltf's Composite Ex. 2).

On May 28, 1976, when Messrs. Jackson and Harris were examined under oath by counsel for the defendants, they testified that the property which they purchased in Athens, Georgia, in November, 1975, was of the actual cash value of $959,125 when destroyed. (Defts' Ex. 30, pp. 59–69, 74).

*Discussion*

Each of the five insurers provided fire insurance on the vinyl auto tops, with the following limits of coverage (Pltf's Composite Ex. 1):

| | |
|---|---|
| California Union | $90,000 |
| Bellefonte | $60,000 |
| Underwriters at Lloyd's | $30,000 |
| Canadian Universal | $50,400 |
| Sphere | $50,400 |
| Total | $280,800 |

Each policy provided that the insurer named therein insured the plaintiff in an

amount not exceeding its policy limits as follows:

> ... to the extent of the actual cash value of the property at the time of loss, but not exceeding the amount which it would cost to repair or replace the property with material of like kind and quality within a reasonable time after such loss, ...

The above quoted language was standard and was adopted from the New York Standard Fire Insurance Policy.

The Courts in Florida have adopted what is known as the "Broad Evidence Rule," and have determined the criteria to be used to define the phrase "actual cash value" as used in property insurance policies. *New York Central Mutual Fire Ins. Co. v. Diaks*, 69 So.2d 786 (Fla.1954); *Worcester Mutual Fire Ins. Co. v. Eisenberg*, 147 So.2d 575 (Fla. 3d DCA 1962); *Berkshire Mutual Ins. Co. v. Moffett*, 378 F.2d 1007 (5th Cir. 1967).

In *Eisenberg, supra*, the court had under consideration a windstorm loss which resulted in the destruction of the contents of a men's clothing store. The two insurance policies there involved each contained the same insuring provisions concerning "actual cash value" as are quoted above. In that case, the insured's evidence showed that, ten days prior to the loss, a complete inventory had been made, which reflected the wholesale cost of each item on the inventory. In the trial court, judgment was entered against the insurers. On appeal, the insurers, among other things, questioned the sufficiency of the evidence as to the actual cash value of the property destroyed. The appellate court affirmed the judgment, and, in discussing the actual cash value of the destroyed stock of merchandise, the court said, at 147 So.2d 576:

> In order to establish to what extent an insurer is liable where "actual cash value" is the yardstick used to determine damages, it is necessary to determine what criteria is to be used to define this phrase. In *New York Central Mutual Fire Ins. Co. v. Diaks*, Fla. 1954, 69 So.2d 786, the Supreme Court indicates that in these matters Florida will adhere to the so-called "Broad Evidence Rule." Under this rule, any evidence *logically* tending to establish a correct estimate of the value of the damaged or destroyed property may be considered by the trier of facts to determine "actual cash value" at the time of loss. *Where, as in this case, evidence of the wholesale cost of the destroyed merchandise is presented, it constitutes relevant evidence of actual cash value.* Therefore, we think the trial judge correctly denied appellants' motion for new trial made on the ground that there was no evidence of actual cash value. (emphasis supplied)

The *Eisenberg* decision is applicable to and controlling of the issue relating to the actual cash value of the insured vinyl auto tops at the time of their loss by fire.

Substantial and undisputed evidence traced the history of the tops. Pop's Top Shops, Inc., sold all of its assets to Pop's Vinyl Tops, Inc., on April 30, 1975 for the sum of $75,000. Such assets included, among other things, 8,478 pre-made vinyl roof tops which were sold at $3 each or for the sum of $25,434 and 17,080 yards of vinyl roll goods which were sold for $19,320, all aggregating $44,754. The vinyl tops and roll goods were obsolete and were for auto models for the years 1968 · through 1974.

In late November 1975, Pop's Vinyl Tops, Inc., sold approximately 12,000 obsolete pre-made vinyl auto tops and some other goods to Messrs. Jackson and Harris for $10,000. The vinyl materials sold to Messrs. Jackson and Harris comprised approximately 25% of the remaining stock of obsolete pre-made roof tops and obsolete vinyl roll goods which Pop's Vinyl Tops, Inc. had acquired from Pop's Top Shop, Inc. Pop's Vinyl Tops, Inc., retained possession of the other 75% of such stock.

On February 6, 1976, the plaintiff became the owner of the pre-made tops which Messrs. Jackson and Harris had purchased from Pop's Vinyl Tops, Inc. On or about February 10, 1976, the plaintiff's tops were totally destroyed by fire.

No substantial evidence was introduced which established that the vinyl auto tops had increased in value during the two and

one–half month period between late November 1975, and the date of the loss.

The evidence did establish that Pop's Vinyl Tops, Inc., still had on hand as of the date of the fire and for a reasonable time thereafter sufficient obsolete vinyl pre-made tops and rolls of vinyl materials with which to replace the plaintiff's tops which were destroyed.

There was no substantial evidence introduced to show that, after the fire loss, the plaintiff attempted to replace the tops which had been destroyed by fire with similar tops then in possession of Pop's Vinyl Tops, Inc., or which could have been manufactured by the latter.

The vinyl auto tops purchased from Pop's Vinyl Tops, Inc., constituted a stock in trade to be sold by Messrs. Jackson and Harris or the plaintiff (1) as individual tops to their customers and installed on the automobiles of such customers, and (2) as individual tops or in small quantities to other vinyl auto top installers.

■ Ordinarily, the proper measure of damages for loss or destruction of personal property is its market value on the date of the loss. *Allied Van Lines, Inc. v. McKnab*, 331 So.2d 319 (Fla. 2d DCA 1976); *Allstates Van Lines Corp. v. Lebenstein*, 303 So.2d 33 (Fla. 3d DCA 1974); *Hillside Van Lines, Inc. v. Matalon*, 297 So.2d 848 (Fla. 3d DCA 1974); *McDonald Air Conditioning, Inc. v. John Brown, Inc.*, 285 So.2d 697 (Fla. 4th DCA 1973).

■ The foregoing measure of damages applies to a stock in trade, if the latter has a market value on the date of the loss. The market value of a stock in trade is what it could have been promptly sold for in bulk at the time of the loss.

In the case at bar, there was no substantial evidence introduced to show whether the vinyl auto tops could have been sold in bulk as of the date of the loss, and, if so, for what amount.

■ When there is no market value for a stock in trade which has been lost or destroyed, according to the great weight of authority, the proper measure of damages is the wholesale cost of the stock in trade, plus freight, and not the retail selling price. *Millison v. Ades of Lexington, Inc.*, 262 Md. 319, 277 A.2d 579 (1971); *Whaley v. Crutchfield*, 226 Ark. 921, 926, 294 S.W.2d 775, 779 (1956); *Dubiner's Bootery, Inc. v. General Outdoor Advertising Co.*, 10 A.D.2d 923, 200 N.Y.S.2d 757, 758 (1960); *Irv–Bob Formal Wear v. Pub. Ser. Mut. Ins.*, 81 Misc.2d 422, 366 N.Y.S.2d 596, 603 (N.Y.C.Civ.Ct.1975); *John Blaul & Sons v. Wandel*, 137 Iowa 301, 114 N.W. 899, 902 (1908); *International Harvester Co. of America v. Chicago, M. & St. P. Ry Co.*, 186 Iowa 86, 172 N.W. 471 (1919); *Lubin v. Iowa City*, 257 Iowa 383, 131 N.W.2d 765, 772 (1964); *Skaggs Drug Centers, Inc. v. City of Idaho Falls*, 90 Idaho 1, 407 P.2d 695, 699–700 (1965); *Mock v. Terry*, 251 Or. 511, 446 P.2d 514 (1968); *Needham Piano & Organ Co. v. Hollingsworth*, 91 Tex. 49, 40 S.W. 787 (1897); *Missouri, K. & T. Ry. of Texas v. Cadenhead*, 164 S.W. 395 (Tex.Civ.App.1914); *Shield Co. v. Cartwright*, 172 S.W.2d 108, 112–113 (Tex.Civ.App.1943), affirmed 142 Tex. 324, 177 S.W.2d 954 (1944).

The authorities cited in the preceding paragraph make clear the legal principles hereinafter set forth.

■ In the admission of evidence concerning the value of a stock in trade which has been lost or destroyed, it is improper and constitutes reversible error for a court to equate the "fair market value of goods on the day they were destroyed or lost" with the retail selling price of the goods as of that date.

■ When dealing with the loss or destruction of a stock of goods held for sale, the value to be found is its value as a stock of goods, that is, its wholesale value, without the profit of resale which enters into the retail value; for at the time of valuation that profit has not yet been earned, or, to put the matter in another way, the process of distribution, which brings the goods into the hands of the consumer and thus give them their final increment of value, has not yet taken place.

Where damages for the loss or destruction of a quantity of merchandise are sued for, evidence of the retail price would be unjust, for the merchant in fixing that price takes into consideration not only the cost of the goods to him, but all of his overhead, including rent, labor, taxes, insurance, a reserve for probable bad debts and any other expenses, and then adds to his overhead a percentage of profit.

■ The owner is entitled to recover at such rate as he would have to pay in the nearest market where a like quantity could be bought to replace the property lost or destroyed, and added to this should be the transportation expense necessarily incurred in getting the property so purchased to the owner's place of business.

The recovery of the retail price of the goods on the day of loss would have the same effect as the sale of the goods–without the necessity of incurring normal overhead costs. This accelerated profit would be prejudicial, and to permit it would constitute reversible error.

As previously stated in this opinion, the Court feels that it committed substantial and reversible error in permitting the plaintiff, over the defendants' objections, to introduce the testimony of Mr. Jackson concerning four separate sales of small quantities of the vinyl auto tops, ranging from 20 to 50 tops, to other installers and one purported sale to himself or his company, Sporty Top Shops, Inc., of 500 tops for $13,000, for which last sale no payment ever was made. The sales purportedly occurred between the time the vinyl tops were brought to Tampa, Florida, and the time they were stored in the Harris' building about mid–December, 1975. No tops were sold after such storage.

Mr. Jackson further was permitted to testify that, over a period of time, possibly several years, the padded vinyl tops could be sold for $60 to $70 each, and that the unpadded tops could be sold for $18.50 each.

As also has been mentioned, after the close of all the evidence, the Court erroneously denied the defendants' motion to strike the testimony of Mr. Jackson concerning the aforementioned matters.

As a result of the improper admission into evidence of Mr. Jackson's testimony, and the failure to strike the same, counsel for the plaintiff was able to argue and argued to the jury that the best way to determine the actual cash value of the tops is what they could be sold for, and that if the plaintiff had been able to sell, over a period of time, only 9,000 of its claimed 9,750 unpadded tops at $15 each, or for $135,000, and only 3,000 of its claimed 3,500 padded tops at only $50 each or for $150,000, the plaintiff's aggregate sale price for the tops would be $285,000, which was more than the insurance coverage of $280,800.

There was no evidence of any overhead, including labor, rent, taxes, transportation, insurance and other expenses, the plaintiff incurred or would have incurred in making the past and future sales of the vinyl auto tops.

The Court is convinced that the defendants were prejudiced by the improper admission of the testimony of Mr. Jackson concerning the amount for which isolated sales allegedly were made and concerning the large quantity of the tops which allegedly could have been sold for substantial prices over a long period of time and the argument of plaintiff's counsel to the jury about such matters.

The Court also is of the opinion that the aforesaid testimony of Mr. Jackson was unsupported and self–serving, and that the same did not constitute substantial evidence sufficient to create a jury question as to the actual cash value or replacement cost of the vinyl auto tops. *Comfort Trane Air Conditioning v. Trane Co.,* 592 F.2d 1373, 1383 (5th Cir. 1979); *Yoder Brothers, Inc. v. California–Florida Plant Corp.,* 537 F.2d 1347, 1371 (5th Cir. 1976), *cert. denied* 429 U.S. 1094, 97 S.Ct. 1108, 51 L.Ed.2d 540 (1977).

In this case, in the opinion of the Court, the only substantial evidence properly before the jury was the wholesale cost, to wit, $10,000, of the vinyl auto tops and other materials when they were purchased by Messrs. Jackson and Harris in November

1975. That evidence constituted the sole relevant evidence of the actual cash value of the tops at the time of their destruction in February 1976. *Worcester Mutual Fire Ins. Co. v. Eisenberg, supra.*

QUESTION 1–WHETHER THE DE-
FENDANTS PROVED THAT, IN
THE APPLICATIONS FOR THE IN-
SURANCE POLICIES, THERE
WERE MISREPRESENTATIONS OR
CONCEALMENTS WHICH PRE-
VENTED A RECOVERY UNDER
THE POLICIES

The defendants' first affirmative defense alleged that, in the applications and negotiations for the insurance policies, Messrs. Jackson and Harris misrepresented and grossly exaggerated the actual cash value of the insured vinyl auto tops, and concealed from the defendants that the tops were obsolete and had been purchased, along with other materials, for $10,000 in November, 1975. The defendants further asserted that the plaintiff was prevented from any recovery under the policies, because said misrepresentations and concealments were either (a) fraudulent, or (b) material to the acceptance of the risk by the defendants, or (c) the defendants, in good faith, would not have issued their respective policies or would not have issued them in as large amounts as they did, if the true facts concerning the actual cash value, obsolescence and the cost of the tops had been made known to the defendants at the time of the applications for the policies or otherwise.

The evidence concerning the actual cash value of the tops and that replacement tops were available, and the basis of the Court's opinion that such value did not exceed $10,-000 at the times of the applications for the insurance and at the time of loss, were set forth above in the Court's treatment of the "actual cash value" of the tops and such evidence was relevant in determining the answer to Question 1.

Additional evidence concerning the applications and negotiations for the insurance and relating to the underwriting policies of the defendants also was relevant and will be stated, after which the applicable legal principles will be discussed.

*The Evidence*

After transporting the vinyl auto roof tops from Athens to Tampa, and on or before December 16, 1975, Messrs. Jackson and Harris contacted Mr. Michael Escot, of Richard B. Berk, Inc., an insurance brokerage firm in New York, New York, and requested him to obtain insurance coverage in the amount of $180,000 insuring the tops against loss by fire and other perils.

Richard B. Berk, Inc., contacted Mr. R. H. Smith, a licensed general insurance agent engaged in business in Miami, Florida, and requested the latter to procure $180,000 insurance coverage on the tops, which were then stored in the Harris' building.

Mr. Smith, as a producing agent under the Florida Surplus Lines Law (§§ 626.913–626.937, Fla.Stat.), contacted Hull & Company, Inc., of Ft. Lauderdale, Florida, a licensed surplus lines agent, and requested $180,000 worth of insurance coverage on the tops insuring them against the perils of fire and lightning, extended coverage and vandalism and malicious mischief. He requested that the tops be insured in the name of Sunstate Roofing Company. Sunstate was a commercial and residential roofing corporation owned or controlled by Mr. Harris, and which had its offices in the other two rooms of the Harris' building in which the auto tops were stored.

In negotiations for the insurance, it was agreed that 80% co–insurance would be applicable. The standard co–insurance provisions contemplated in the negotiations and set forth in the policies when issued provided, in pertinent part, as follows (Pltf's Composite Ex. 1):

8. Co–Insurance–It is a part of the conditions of this policy, and the basis upon which the rate of premium is fixed, *that the Insured shall at all times maintain insurance on each item of property covered by this policy of not less than the percentage specified on the first page of this policy, of the actual cash value there-*

*of*, and that, failing so to do, the Insured shall be an insurer to the extent of such deficit, and in that event shall bear his, her or their proportion of any loss. (Emphasis supplied)

The percentage of co–insurance specified on the first page of each of the policies was 80% co–insurance applicable.

In the light of the applicable co–insurance provisions, Mr. Smith's request for insurance in the amount of $180,000 was a representation, on behalf of Messrs. Jackson and Harris, to Hull & Company, Inc., as agent for the insurers, that the amount of insurance coverage requested was not less than 80% of the actual cash value of the property to be covered by the insurance.

Mr. Smith did not inform Hull & Company, Inc., that the tops were obsolete or that the same had been purchased, along with other goods, for $10,000 in November 1975.

Hull & Company, Inc., arranged for the requested insurance, effective December 16, 1975, with three of the defendants participating, to wit, California Union, Bellefonte and Underwriters at Lloyds, which issued insurance policies in the amounts of $90,000, $60,000 and $30,000; respectively. The insured named in the policies was Sunstate Roofing Company, although it had no insurable interest in the insured property.

After the incorporation of the plaintiff on January 29, 1976, and on or before February 4, 1976, Mr. Smith, acting as insurance broker for the plaintiff, again contacted Hull & Company, Inc., and requested additional insurance coverage in the amount of $100,800 on the vinyl auto tops. Mr. Smith asked that the plaintiff be named as insured and that the plaintiff be named as insured in the three policies initially issued. As before, it was agreed that 80% co–insurance would be applicable. Again, Mr. Smith did not inform Hull & Company, Inc., of the obsolescence of the tops or their cost in November 1975.

The request by Mr. Smith, as broker for the plaintiff, to the defendants' agent for the additional coverage constituted a representation that the aggregate coverage requested of $280,800 was not less than 80% of the actual cash value of the tops to be covered by the insurance.

Hull & Company, Inc., obtained the additional coverage from the other two defendants, effective February 4, 1976, with Canadian Universal and Sphere each writing $50,400 coverage on the tops. The last two policies were issued in the name of the plaintiff. At the same time and effective the same date, the three original policies were endorsed to change the named insured therein from Sunstate Roofing Company to the plaintiff. The two new policies contained the same co–insurance provisions as the three earlier policies.

The insured vinyl auto tops were totally destroyed in fires which occurred on February 9 and 10, 1976.

The plaintiff submitted the previously mentioned sworn statements in proof of loss. The defendants denied liability. Suit ensued. As its first affirmative defense, the defendants pleaded that the plaintiff was prevented from recovering because of misrepresentations as to the actual cash value of the tops and concealment of the obsolescence and purchase price of the tops in the applications and negotiations for the policies.

At the trial, Mr. Jerrold Goldstein, the Underwriting Manager of Hull & Company, Inc., who underwrote the insurance coverage on behalf of the several defendants, testified that the initial representation by Mr. Smith, on behalf of the insured, that $180,000 was at least 80% of the actual cash value of the tops, and the later representation by Mr. Smith that $280,800 was at least 80% of the actual cash value of the vinyl auto tops, and the concealment of the obsolescence and purchase price of the tops and other materials were material to the acceptance of the insurance risks by the respective defendants. He also testified that Hull & Company, Inc., and the defendants, in good faith, would not have issued the insurance policies, or would not have issued them in the amounts that they did, if they had known the true facts concerning the actual cash value, obsolescence and the purchase price of the tops.

Mr. Goldstein also testified that initially insuring the tops for at least 18 times their cost, and later for at least 28 times their cost, constituted a moral hazard which was so great that the defendants, and Hull & Company, Inc., as their agent, would not have issued the respective policies if they had known the true facts.

Mr. Goldstein further testified that neither Mr. Smith, Mr. Escot nor Richard B. Berk, Inc., was a licensed agent of any of the five defendants or of Hull & Company, Inc.

Mr. Smith was the only one on behalf of Messrs. Jackson and Harris, the plaintiff, Mr. Escot and Richard B. Berk, Inc., who contacted Hull & Company, Inc. Neither Mr. Jackson, Mr. Harris, Mr. Escot, Richard B. Berk, Inc., nor Mr. Smith directly contacted any of the defendants.

### Discussion

Mr. Escot, Richard B. Berk, Inc., and Mr. Smith were insurance brokers for and agents of Messrs. Jackson and Harris and the plaintiff, and neither of such parties was an agent of Hull & Company, Inc., or the defendants. *Auto–Owners Ins. Co. v. Yates*, 368 So.2d 634 (Fla. 2d DCA 1979).

Neither Mr. Escot, Mr. Smith nor anyone acting on behalf of Richard B. Berk, Inc., testified in person or by deposition at the trial.

The undisputed evidence showed that Mr. Smith was the only one acting on behalf of Messrs. Jackson and Harris and the plaintiff who applied to and negotiated for insurance on the vinyl auto tops with Hull & Company, Inc., as agent for the defendants.

The co–insurance provisions of the insurance policies required the insured to maintain insurance on the vinyl auto tops of not less than 80% of the actual cash value thereof.

When Mr. Smith applied for coverage on the tops in the amount of $180,000, his application constituted a representation that the actual cash value of the tops was at least $180,000. Later, when Mr. Smith applied for additional insurance of $100,800, making aggregate insurance of $280,800, his application constituted a representation that the actual cash value of the tops was at least $280,800.

Although Messrs. Jackson and Harris testified during the trial that, at the time Mr. Escot was asked to procure $180,000 insurance coverage on the tops, Mr. Escot was told the amount of the purchase price of the tops and other goods, there was no evidence that Mr. Escot or Richard B. Berk, Inc., or anyone else informed Mr. Smith or that Mr. Smith or anyone else informed Hull & Company, Inc., of such purchase price.

During the trial, Messrs. Jackson and Harris testified that, after the plaintiff was incorporated, they requested Mr. Escot to procure for the plaintiff $100,800 insurance coverage on 2,600 sets of the 15,000 sets of vinyl (plastic) belt moldings which they had purchased along with the vinyl auto tops and other goods. When examined under oath, they testified they requested Mr. Escot to insure 2100 sets of the moldings for $100,800. They also testified at the trial and when examined under oath that the actual cash value of the 15,000 sets of moldings was $720,000, or $48 per set. There, however, was no evidence that Mr. Escot or Richard B. Berk, Inc., or anyone else asked Mr. Smith to obtain insurance on the moldings, or that Mr. Smith or anyone else ever applied to Hull & Company, Inc., for any insurance on the moldings.

The testimony of Messrs. Jackson and Harris concerning advice to Mr. Escot of the purchase price of the goods, and relating to their request that Mr. Escot obtain $100,800 insurance on the moldings was irrelevant, because there was no evidence that information concerning the cost of the goods and any request for insurance on the moldings was ever furnished to Hull & Company, Inc. Further, such testimony on the part of Messrs. Jackson and Harris was unsupported and self–serving, and did not constitute substantial evidence sufficient to create a jury question concerning whether Hull & Company, Inc., had information concerning the purchase price of the goods prior to issuing the policies or whether Mr.

Smith requested Hull & Company, Inc., to insure the moldings.

The defendants' first affirmative defense was predicated primarily upon the provisions of Section 627.409(1), Florida Statutes (1975), relating to applications and negotiations for an insurance policy, which provides as follows:

(1) All statements and descriptions in any application for an insurance policy or annuity contract, or in negotiations therefor, by or in behalf of the insured or annuitant, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of facts, and incorrect statements shall not prevent a recovery under the policy or contract unless either:

(a) Fraudulent; or

(b) Material either to the acceptance of the risk or to the hazard assumed by the insurer; or

(c) The insurer in good faith would either not have issued the policy or contract, or would not have issued it at the same premium rate, or would not have issued a policy or contract in as large an amount, or would not have provided coverage with respect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or contract or otherwise.

A representation is "fraudulent" within the meaning of Section 627.409(1)(a), if known to be untrue or is made with reckless indifference as to its truth or falsity, and if made or caused to be made with the intent to deceive.

A "fraudulent misrepresentation" may be made by statements of half truths or the concealment of material facts, as well as by affirmative statements or acts.

Messrs. Jackson and Harris paid $10,000 for the obsolete vinyl auto tops and other goods in late November 1975, but three weeks later they represented or caused to be represented to three of the defendants that the actual cash value of the tops was at least $180,000, and applied for and received insurance in that amount. Then seven weeks later, they represented or caused to be represented to the other two defendants that the actual cash value of the tops was at least $280,800, and applied for and received additional insurance in the amount of $100,800. In the applications and negotiations for the insurance, the facts concerning the obsolescence and cost of the tops were concealed from the defendants.

After considering all of the admissible relevant and substantial evidence, in the light and with all reasonable inferences most favorable to the plaintiff, the Court concluded that the facts and inferences pointed strongly and overwhelmingly to the fact that the aforementioned representations concerning the actual cash value of the tops were fraudulent, because the same were known to be untrue when made or were made with reckless indifference as to their truth or falsity, and were made or caused to be made with the intent to deceive the defendants.

Such facts and inferences pointed so strongly and overwhelmingly in favor of the defendants with respect to their defense predicated on the provisions of Section 627.-409(1)(a) that the Court believed that reasonable men could not arrive at a contrary verdict. The Court further felt that there was no conflict in the admissible and substantial evidence to create a jury question concerning this defense.

The Court's conclusions, beliefs, rulings and orders would have been the same as set forth above if the admissible and substantial evidence had established that Messrs. Jackson and Harris had represented or caused to be represented to the defendants that the actual cash value of the vinyl auto tops and the 2600 sets of vinyl (plastic) belt moldings were $180,000 and $100,800, respectively, and that they had applied for and had been issued insurance in such amounts on the tops and moldings, respectively.

Florida courts have interpreted Section 627.409(1)(b) and (c), Florida Statutes (1975), to mean that even an innocent misrepresentation, omission, concealment of facts or incorrect statement can bar a re-

covery, if it is material to the acceptance of the risk by the insurer, or if the insurer, in good faith, would not have issued its policy or would not have issued its policy under the same terms if it had known the truth. *Hyman v. Life Insurance Company of North America*, 481 F.2d 441, 443 (5th Cir. 1973); *Allstate Ins. Co. v. Winnemore*, 413 F.2d 858 (5th Cir. 1969); *Bishop v. Franklin Life Ins. Co.*, 412 F.2d 949 (5th Cir. 1969), appeal after remand 435 F.2d 173; *Roess v. St. Paul Fire & Marine Ins. Co.*, 383 F.Supp. 1231 (M.D.Fla.1974); *Life Insurance Company of Virginia v. Schifflet*, 201 So.2d 715, 719 (Fla.1967); *New York Life Ins. Co. v. Nespereira*, 366 So.2d 859 (Fla. 3d DCA 1979); *Independent Fire Ins. Co. v. Horn*, 343 So.2d 862, 865 (Fla. 1st DCA 1977); *Travelers Ins. Co. v. Zimmerman*, 309 So.2d 569 (Fla. 3d DCA 1975).

In *Schifflet, supra*, the Supreme Court of Florida said, at 201 So.2d 719:

We hold representations in an application for insurance, material to the acceptance of the risk, do not have to be made with knowledge of the incorrectness and untruth to vitiate the policy. This conclusion appears to be in harmony with the general rule approved in other jurisdictions.

In *Horn, supra*, the court said "false material statements on the application vitiate the policy regardless of intent."

There was no substantial evidence which conflicted with the testimony of Mr. Goldstein, who underwrote the insurance coverages for the defendants, that the actual cash value of the vinyl auto tops was material to the acceptance of the risk, and that the defendants would not have issued their policies if they had known that the tops were obsolete and had cost only $10,000.

There also was no evidence to contradict the testimony of Mr. Goldstein that initially insuring the tops for at least 18 times their cost, and later for at least 28 times their cost, created a moral hazard which was so great that the defendants would not have issued their respective policies or would not have issued them in the amounts they did if they had known the true facts concerning age and cost of the tops.

Moral hazard is the risk, the danger, or probability that the insured will destroy or permit to be destroyed the insured property for the purpose of collecting the insurance. The moral hazard is an important element, beginning with the application for a policy, during the underwriting process to determine whether the insurer will accept the risk, and continuing through the entire term a policy is in force and effect.

In *Connecticut Fire Ins. Co. v. Manning*, 160 F. 382 (8th Cir. 1908), which involved a fire insurance policy on a dwelling, the court said at page 385:

The property insured against fire in this policy, and in like policies of insurance ordinarily, is not the real or personal property described therein, but it is the interest of the assured in that property. The extent of his interest is therefore necessarily material to the risk which the underwriter assumes. The moral hazard is one of the main elements, if not the chief element, of an insurance risk, and it is never negligible. It is always material to the risk. Moral hazard is but another name for a pecuniary interest in the assured to permit the property to burn. Statistics, experience, and observation all teach alike that the moral hazard is least when the pecuniary interest of the assured in the protection of the property against fire is greatest, and the moral hazard is greatest when the assured may gain the most by the burning of property. The extent of the interest of the assured in the property insured measures the moral hazard, and hence is always material to the risk of the insurance....

The *Manning* case was cited with approval in *Chaachou v. American Central Insurance Company*, 241 F.2d 889 (5th Cir. 1957), where the court said, at page 893:

Courts have long recognized that, "The moral hazard is one of the main elements, if not the chief element, of an insurance risk, and it is never negligible. It is always material to the risk", *Connecticut Fire Ins. Co. v. Manning*, 8 Cir., 160 F. 382, 385. It reflects the assumption that

the relationship created by the contract is one requiring the utmost of honest, good faith dealing. *Globe & Rutgers Fire Ins. Co. v. Stallard*, 4 Cir., 68 F.2d 237, 240 . . . .

The *Manning* case again was cited with approval in *Niagara Fire Insurance Company v. Everett*, 292 F.2d 100 (5th Cir. 1961), where the court said, at page 105:

> . . . Moral hazard, in insurance, is but another name for a pecuniary increase to the insured should the property burn. Statistics, experience, and observation all teach that the moral hazard is least when the pecuniary interest of the insured in the protection of the property against fire is greatest, and the moral hazard is greatest when the insured may gain most should the property burn. (Citations omitted) . . .

It was undisputed that the tops cost Messrs. Jackson and Harris $10,000. The admissible, relevant and substantial evidence showed that the actual cash value of the tops did not exceed that sum between the time they were purchased and the time they were destroyed by fire. Such evidence established that the representations made, in applying for the policies, that the actual cash value of the tops was $180,000 in mid · December 1975 and was $280,800 in early February 1976 were untrue.

The value of the tops and the interest of Messrs. Jackson and Harris and the plaintiff therein on those two occasions were material to the acceptance of the risk of the defendants.

The undisputed evidence showed that insuring the tops for 18 times and later 28 times their cost created an increase in hazard so great that the defendants would not have issued their policies if they had known the true facts.

After considering all of the evidence relative to the defendants' defenses based upon Section 627.409(1)(b) and (c), in the light and with all reasonable inferences most favorable to the plaintiff, the facts and inferences pointed so strongly and overwhelmingly in favor of the defendants with respect to those separate defenses that the Court believed that reasonable men could not arrive at a contrary verdict. The Court further found that there was no conflict in admissible substantial evidence to create a jury question with respect to those defenses.

Although the defenses under the statute were asserted in the alternative, the Court was of the opinion that the provisions of subsections (a), (b) and (c) were applicable and prevented any recovery under the policies. Therefore, the defendants' motion for judgment n.o.v. was granted with respect to Question 1 of the Special Verdict.

After reviewing all of the admissible evidence applicable to the defenses under the statute, the Court was of the opinion that the jury's verdict was against at least the great weight of the evidence, that the jury's verdict was excessive, that the Court had improperly admitted evidence concerning the prices for which small quantities of the tops had been sold and for which the same might have been sold in the future, that there were reasonable grounds to believe that the jury's answer to this question was the result of sympathy, prejudice, giving of undue weight to improperly admitted evidence, mistake, confusion or other improper cause, and that the jury's special verdict with respect to this question would result in a miscarriage of justice. Therefore, the Court granted the defendants' motion for a conditional new trial.

QUESTION 2–WHETHER THE DEFENDANTS PROVED THAT THE PLAINTIFF BURNED, OR PROCURED OR CAUSED THE BURNING OF THE INSURED PROPERTY

The second affirmative defense of the defendants asserted that each of the insurance policies was rendered void and the plaintiff was barred from any recovery against the defendants, because of the plaintiff's fraud in burning, or causing or procuring the burning of the insured property.

Much of the evidence previously mentioned with respect to the actual cash value of the vinyl auto tops and the defendants' first affirmative defense was relevant to the defendants' second affirmative defense.

Other evidence relating to this defense will be stated.

### The Evidence

Each of the insurance policies contained, in numbered lines 1–6 thereof, the following provisions relating to concealment and fraud:

This entire policy shall be void if, whether before or after a loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning this insurance or the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

Each of the policies also contained the following provisions in numbered lines 28-32:

Conditions suspending or restricting insurance. Unless otherwise provided in writing added hereto this Company shall not be liable for loss occurring (a) while the hazard is increased by any means within the control or knowledge of the insured; or . . .

On Friday, February 6, 1976, three days before the first fire on the night of Monday, February 9, 1976, Mr. Harris personally paid the premium on a fire insurance policy issued by The North River Insurance Company which provided fire insurance coverage in the amount of $20,000 on the building owned by Mr. and Mrs. Harris and $5,000 coverage on the contents thereof.

Messrs. Jackson and Harris testified that they and their families went to Disney World on the afternoon or evening of February 6, 1976, and returned on the night of February 9, 1976, to find that the building in which the vinyl auto tops had been stored had been damaged by fire.

The first fire occurred about 9:00 P.M., February 9, 1976. A nearby volunteer fire department responded to notice of the fire. When they arrived, fire department personnel found that all doors of the building were closed and locked. To gain access to the building they removed the hinges of one door and kicked in another. They found three five–gallon plastic containers filled with gasoline in one of the rooms in which the tops were stored. Such containers were removed from the building and placed outside near an air compressor unit. The fire was extinguished after it had caused some damage to the building and slight damage to the insured property.

Mr. Harris testified that gasoline was not supposed to be kept in the building, that he was the last person to leave the building on the afternoon of February 6, 1976, that he locked all doors of the building and that no one was supposed to have been at the building on Saturday, February 7th, Sunday, February 8th, or on Monday, February 9th, which was a holiday.

Mr. Harris also testified that the only persons having keys to the building were himself, his wife and three business associates.

Mrs. Helen Schull, a neighbor who lived south of the Harris' building, after dark, on Tuesday, February 10, 1976, saw five or six adults leaving the damaged building and walking toward the Harris' residence, which was situated about 500 feet directly west of the building in which the tops were stored. Almost immediately after those individuals left, she heard several heavy explosions, and looked and observed that the Harris' building instantly was almost completely engulfed in flames throughout each room thereof. Other witnesses heard the explosions and saw the rapid spread of the fire.

Again, the fire department responded promptly to the fire, and found the building fully engulfed. Fire department personnel testified that an accellerant had been used, that they were unable to extinguish the fire and that they monitored the fire until it consumed the building and contents.

Fire department personnel and other expert witnesses testified that there was no evidence that either fire resulted from accidental causes, and that each of the fires was of incendiary origin.

On the night of the second fire, after the other fire department personnel and equipment had left the scene of the fire, Fire Chief Harry Gurr remained to assure that the fire did not spread to adjoining properties. He saw a white automobile approach on Nixon Road, turn into the driveway and

stop near the burning building. He saw three men get out of the vehicle, walk around the fire scene and heard one of them say "Well, we finally got the job done right this time." The men did not see him, got back into their vehicle and left before he had an opportunity to get the license number of the car.

The undisputed evidence showed that, prior to and on the dates of the two fires, there were judgments and liens against Mr. Jackson and/or Sporty Top Shops, Inc., aggregating $10,938.92 (Deft's Ex. 22 and 23), and judgments and liens against Sunstate Roofing, Inc., Mr. Harris' corporation, aggregating $16,191.07 (Deft's Ex. 24).

The defendants introduced the deposition testimony of William Noriega. He testified that in early February, 1976, a few days before the fires, Mr. Harris told him they were going to have a fire, and that a few days later, Mr. Harris told him about the fires, including the fact that the first fire did not destroy the insured property, and that it was necessary to set the fire a second time, which was done.

Mr. Noriega further testified that on one occasion Mr. Harris told him the vinyl roof tops were over-insured. He testified that on another occasion he was with Mr. Harris and a Mr. George Garcia, and the latter explained, in the presence of Mr. Harris, how he had set the first fire, using an electrical timing device, that the fire department extinguished the fire and that they had to set the fire a second time.

Messrs. Jackson and Harris denied having burned or caused or procured the burning of the insured property, and denied having been in poor financial circumstances. Mr. Harris denied having the conversations with Mr. Noriega which the latter testified about.

Mr. George Garcia, a witness for the plaintiff, testified that he was a friend of Messrs. Jackson and Harris, that he was fifty-two years of age and had made a career in the U. S. Army, where he served in the infantry, airborne and air assault forces, before retiring January 1, 1975. He testified that as of February, 1976 he was a journeyman electrician, was capable of re-pairing television and radio sets, that he could repair automobiles and that his hobby was collecting, assemblying and repairing antique clocks and pocket watches.

Mr. Garcia denied having anything to do with the fires, and denied having had any conversation with Mr. Noriega concerning the fires.

## Discussion

Ordinarily an arson defense is proved when a fire insurer establishes by a preponderance of the evidence that the insured had sufficient motive and opportunity to commit arson and that there was an incendiary cause of fire. *Cora Pub, Inc. v. Continental Cas. Co.*, 619 F.2d 482, 485 (5th Cir. 1980).

There was substantial evidence to show that Messrs. Jackson and Harris, who were the plaintiff's sole stockholders, directors, officers and managers, had sufficient motive to commit arson. There was undisputable evidence in the form of certified copies of judgments or other liens which showed that Mr. Jackson, individually, and his corporation, Sporty Top Shops, Inc., and Mr. Harris' corporation, Sunstate Roofing, Inc., were indebted to various creditors for amounts aggregating $27,-129.99. Most of those debts were in existence prior to the acquisition by Messrs. Jackson and Harris of the obsolete vinyl auto tops.

Further, after acquiring the tops, which the admissible substantial evidence showed had an actual cash value of not in excess of $10,000, Messrs. Jackson and Harris insured them for $180,000, effective December 15, 1975, and for an additional $100,800, effective February 4, 1976, five days before the first fire occurred. By thus greatly over-insuring the tops, a moral hazard was created when the first insurance was procured, which was greatly increased when the additional insurance was procured.

Thus, undisputed substantial evidence showed that Messrs. Jackson and Harris needed money to pay the judgment and other lien creditors of themselves and their corporation, and that they would have gained most should the insured tops burn.

There also was substantial undisputed evidence to show that Messrs. Jackson and Harris had the opportunity to commit arson. The tops were stored in a building owned by Mr. and Mrs. Harris which was situated in a rural area. Only Mr. and Mrs. Harris and three business associates of Mr. Harris had keys to the premises. Messrs. Jackson and Harris had access to the building where the tops were stored. They also could have furnished a key which would have given one or more others access to the building for the purpose of arranging an incendiary fire. The evidence was undisputed that the first fire originated inside the building, and that the doors of the building were locked when the fire department arrived to fight the first fire.

The evidence is undisputed that both fires were of incendiary origin.

After reviewing all of the evidence pertinent to this defense, the Court was of the opinion that there was a conflict in substantial evidence which precluded the direction of a verdict for the defendants and the granting of the defendants' motion for judgment notwithstanding the verdict. However, it was the opinion of the Court that the jury's verdict was at least against the great weight of the evidence, and that the granting of the defendants' motion for new trial was appropriate in order to avoid a miscarriage of justice. Other grounds existed also for granting the defendants' motion for new trial, including those assigned as grounds for granting a new trial with respect to the defendants' first affirmative defense.

QUESTION 3—WHETHER DEFENDANTS PROVED THAT PLAINTIFF WILFULLY MISREPRESENTED THE VALUE OF THE INSURED PERSONAL PROPERTY DAMAGED OR DESTROYED IN COMPLETING THE PROOFS OF LOSS OR INVENTORY SUBMITTED AS A PART THEREOF, OR WHEN PLAINTIFF'S REPRESENTITIVES WERE EXAMINED UNDER OATH AFTER THE LOSS

 The defendants' third affirmative defense was predicated upon wilful misrepresentations and false swearing by the plaintiff's representatives in the sworn statements in proof of loss which were rendered to the respective defendants and during the examination under oath of such representatives.

Most of the evidence applicable to this defense has been set forth in the evidence pertinent to the actual cash value of the vinyl auto tops and in connection with Question 1. However, certain additional provisions of each of the insurance policies are deemed controlling and will be set forth.

### The Evidence

In numbered lines 90 through 122 of each insurance policy, relating to requirements in case loss occurs, the following provisions appear:

The insured shall give immediate written notice to this Company of any loss, protect the property from further damage, forthwith separate the damaged and undamaged personal property, put it in the best possible order, furnish a complete inventory of the destroyed, damaged and undamaged property, showing in detail quantities, costs, actual cash value and amount of loss claimed; and within sixty days after the loss, unless such time is extended in writing by this Company, the insured shall render to this Company a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to the following: the time and origin of the loss, the interest of the insured and of all others in the property, the actual cash value of each item thereof and the amount of loss thereto, all encumbrances thereon, all other contracts of insurance, whether valid or not, covering any of said property, any changes in the title, use, occupation, location, possession, or exposures of said property since the issuing of this policy, by whom and for what purpose any building herein described and the several parts thereof were occupied at the time of loss

and whether or not it then stood on leased ground, and shall furnish a copy of all the descriptions and schedules in all policies and, if required, verified plans and specifications of any building, fixtures or machinery destroyed or damaged. The insured, as often as may be reasonably required, shall exhibit to any person designated by this Company all that remains of any property herein described, and submit to examinations under oath by any person named by this Company and subscribe the same; and as often as may be reasonably required, shall produce for examination all books of account, bills, invoices and other vouchers, or certified copies thereof if originals be lost, at such reasonable time and place as may be designated by this Company or its representative, and shall permit extracts and copies thereof to be made.

### Discussion

As previously mentioned, numbered lines 1 through 6 of each policy provides that the same shall be void if, whether before or after the loss, the insured has wilfully concealed or misrepresented any material fact or circumstance concerning the insurance of the subject thereof, or the interest of the insured therein, or in case of any fraud or false swearing by the insured relating thereto.

The provisions containing the requirements in case a loss occurs specified that the insured, among other things, submit an inventory of the destroyed property showing, among other things, the actual cash value of the destroyed property and the amount of loss claimed. Further, they required the insured to render to the insurer a proof of loss, signed and sworn to by the insured, stating the knowledge and belief of the insured as to a number of items, including the actual cash value of each item of property destroyed and the amount of loss thereto.

After the loss, the plaintiff rendered sworn statements in proof of loss wherein it was stated that the actual cash value of the insured property at the time of the loss was $345,925, and wherein the plaintiff claimed an aggregate loss of $280,800 under the five policies. When the plaintiff's representatives, Messrs. Jackson and Harris, were examined under oath after the loss, each stated that the actual cash value of the destroyed vinyl auto tops was $239,125, as stated in the bill of sale, dated February 6, 1976, from them to the plaintiff. They also stated under oath that the 15,000 sets of vinyl (plastic) belt moldings, which were a part of the goods purchased at the same time as the vinyl auto tops, were of the actual cash value of $720,000, or $48 per set.

The provisions previously quoted from *Chaachou v. American Central Insurance Co.*, 241 F.2d 889, 893 (5th Cir. 1957), *supra*, concerning the moral hazard being a chief element of an insurance risk, and the fact that it reflects the assumption that the relationship created by the contract is one requiring the utmost of honest, good faith dealing, is equally applicable to the defendants' third affirmative defense. In that case, the court held that the clause contained in the first six numbered lines of the policy concerning what will render an insurance policy void is but means of demanding, at a critical time, moral uprightness and conduct of the kind basic to the genesis of the undertaking.

In *Chaachou*, the court recognized that the provisions of lines 1–6 present no danger that valuable rights will be lost by mere mistakes or errors in calculations, exaggerations in the amounts of the claims, or the assertion, even though doubtful, of coverage or other contentions as to all or particular items when these flow from the mistaken good faith judgment or opinion of the assured or its agents. For the courts will make it positive that the insurer must satisfy the heavy burden of establishing that the conduct complained of was done and was a wilful, purposeful misrepresentation of facts having substantial materiality under circumstances to which the law would attribute the intention to defraud, that is, cheat, deceive and cause the insurer to do other than that which would have been done had the truth been told. See also *Yates v. State*

*Farm Fire & Cas. Co.,* 417 F.2d 766 (5th Cir. 1969); *Badger Mutual Insurance Co. v. Morgan,* 313 F.2d 783 (5th Cir. 1963).

The defendants assert that such wilfull misrepresentations and false swearing by the plaintiff's representatives rendered each of the policies void and barred any recovery under the policies.

After reviewing all of the relevant, admissible and substantial evidence related to this defense, in the light and with all reasonable inferences most favorable to the plaintiff, the Court concluded that the facts and inferences pointed so strongly and overwhelmingly in favor of the defendants that the Court believed that reasonable men could not arrive at a verdict contrary to the defendants. Further, the Court was of the opinion that there was no conflict in substantial evidence to create a jury question with respect to this defense. Accordingly, the Court granted the defendants' motion to set aside the jury's response to Question 3 and granted the defendants' motion for judgment notwithstanding the verdict with respect to this defense.

After considering all of the admissible, relevant evidence applicable to this defense, the Court further was of the opinion that the jury's verdict was against at least the great weight of the evidence, and would result in a miscarriage of justice and that the other grounds relied upon by the Court in granting a conditional new trial with respect to the defendants' first affirmative defense were applicable to their third affirmative defense. Accordingly, the Court granted a conditional new trial with respect to this defense.

QUESTION 4–WHAT WAS THE ACTUAL CASH VALUE OF THE INSURED PROPERTY ON THE DATES IT WAS DESTROYED BY THE FIRES?

 Everything previously mentioned under the discussion of the actual cash value of the vinyl auto tops on various occasions is applicable to this action.

After considering all of the admissible, relevant and substantial evidence concerning the actual cash value of the tops at the time they were destroyed, but in the light and with all reasonable inferences most favorable to the plaintiff, it was the Court's opinion that the facts and inferences pointed so strongly and overwhelmingly in favor of the defendants' contention that the actual cash value of the tops did not exceed the sum of $10,000, that the Court believed that reasonable men could not arrive at a contrary verdict. Further, the Court was of the opinion that there was no conflict in substantial evidence to create a jury question with respect to the actual cash value of the insured property. Accordingly, the Court granted the defendants' motion to set aside the jury's answer to Question 4 of the Special Verdict, and entered an order limiting the actual cash value of the insured property to the sum of $10,000.

Because the Court granted the defendants' motion for judgment notwithstanding the verdict with respect to their first and third affirmative defenses, the plaintiff will not be entitled to any recovery in this action. If, however, the Court's order granting the defendants' motion for judgment notwithstanding the verdict with respect to Questions 1 and 3 is vacated or reversed on appeal, and the Court's judgment n.o.v. with respect to Question 4 is affirmed on appeal, then any damages possibly recoverable by the plaintiff will be limited to $10,-000.

After reviewing all of the evidence, the Court was of the opinion that the defendants' motion for new trial should be conditionally granted on all of the grounds hereinbefore assigned for granting a new trial with respect to Question 1.

OTHER GROUNDS FOR GRANTING CONDITIONAL NEW TRIAL

The Court is of the opinion that counsel for the plaintiff made improper and prejudicial statements and was guilty of conduct during the course of the trial which was prejudicial to the defendants.

In the plaintiff's opening statement, its counsel stated to the Court and jury that

the evidence would show that, after the fire of February 9, 1976, took place, one William Noriega took credit for having burned the insured property. However, there was no evidence introduced during the trial to show that Mr. Noriega ever took credit for having burned the insured property. Plaintiff's counsel's statement was particularly prejudicial, because, during the course of the trial, the deposition testimony of Mr. Noriega was offered, and his cross-examination in the deposition showed that he had pleaded guilty to and had been convicted of several charges of arson in a criminal case previously tried in this Court.

Throughout the trial, counsel for the plaintiff asked numerous leading and otherwise improper questions, many of which were objected to by counsel for the defendants and others of which were challenged by the Court. It is the opinion of the Court that this conduct on the part of counsel for the plaintiff resulted in creating in the minds of the jurors sympathy and partiality for the plaintiff and bias or prejudice against the defendants.

Counsel for the plaintiff was guilty of improper conduct prejudicial to the defendants in that he argued to the jury that there was no evidence that the plaintiff failed to represent to or conceal from the defendants that the plaintiff's predecessors paid only $10,000 for the vinyl auto tops and other materials, when the undisputed evidence was that neither the plaintiff, Mr. Escot, Richard B. Berk, Inc., Mr. Smith nor anyone else ever disclosed to the defendants or their agent, Hull & Company, Inc., the cost of the tops.

Counsel for the plaintiff improperly argued to the jury that Mr. Escot, Richard B. Berk, Inc., and Mr. Smith were agents for the defendants, when, in truth and in fact, they were the insurance brokers and agents of the plaintiff and its predecessors, Messrs. Jackson and Harris.

It was the opinion of the Court that the above-described conduct of counsel for the plaintiff at least contributed to the jury basing its verdict upon sympathy, prejudice, mistake, confusion or other improper cause.

It is the Court's belief that the statements and conduct of counsel for the plaintiff contributed substantially to a special verdict which resulted in a miscarriage of justice.

### DIRECTIONS TO CLERK

The Clerk of this Court shall forthwith prepare and submit to the Court for approval before entry a judgment ordering and adjudging that the plaintiff take nothing, that this action be dismissed on the merits, and that the defendants recover of the plaintiff their costs of action.

IT IS SO ORDERED.